William P. MULLEN, Plaintiff,

v.

NEW JERSEY STEEL
CORPORATION, Defendant.

Civ. A. No. 89–1012.

United States District Court,
D. New Jersey.

March 26, 1990.

Joseph A. Eagan, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for plaintiff William P. Mullen.

David L. Ossam, Jackson, Lewis, Schnitzler & Krupman, Morristown, N.J., for defendant New Jersey Steel Corp.

## OPINION AND ORDER

LECHNER, District Judge.

This is an action filed by plaintiff William P. Mullen ("Mullen") against defendant New Jersey Steel Corporation ("NJS") for violations of the Age Discrimination in Em-

ployment Act of 1967, as amended ("ADEA"), 29 U.S.C. § 621 *et seq.*, the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–12, and Section 10(b) of the Securities Exchange Act of 1934 (the " '34 Act"), as amended, 15 U.S.C. § 78j, and for wrongful discharge and breach of contract, common law claims. These alleged violations and claims arise from Mullen's discharge by NJS on 27 July 1987. NJS now moves for summary judgment on all of Mullen's claims.[1] Jurisdiction is obtained through 28 U.S.C. §§ 1331, 1332(a)(1) and principles of pendent jurisdiction.

## I. Facts [2]

The following facts are not in dispute.[3] NJS is a producer of steel and operates a plant in Sayreville, New Jersey. Pasquarelli Aff., ¶ 5. The President and Chief Executive Officer of NJS is Robert J. Pasquarelli ("Pasquarelli"). Mullen and Pasquarelli were friends from 1972 until at least 1983 and business associates until Mullen's termination from NJS in July of 1987. 1 Mullen Dep. at 92, 177–78.

Both Mullen and Pasquarelli worked for North Star Steel Corp. ("North Star") from 1972–1981. Pasquarelli Aff., Ex. A; 1 Mullen Dep. at 92. In 1976 Pasquarelli was promoted to Vice President and General Manager of North Star's Iowa facility.

Soon thereafter Mullen was offered a position as Supervisor of the Rolling Mill in Iowa by the President of North Star, Joseph Klemp. Mullen Aff., ¶ 2. Mullen's promotion was based upon Pasquarelli's recommendation. Mullen Aff., ¶ 12; NJS Facts, ¶ 7.

In December 1977 Pasquarelli was promoted to Vice President and General Manager of North Star's Michigan Plant. In October or November he offered Mullen a promotion at the Michigan plant. Mullen accepted this offer. NJS Facts, ¶¶ 8–9; Mullen Facts, ¶¶ 8–9. In November of 1982, Pasquarelli accepted the position of President of NJS. He then asked Mullen if he would like the position of Vice President of Operations of NJS. Mullen expressed interest and Pasquarelli wrote Mullen's resume and added a personal recommendation.[4] 1 Mullen Dep. at 90–92.

Pasquarelli offered Mullen the position on 6 December 1982 and knew Mullen was forty-four or forty-five years old when he hired him. 1 Mullen Dep. at 93. Mullen began his employment with NJS on 15 January 1983. Mullen satisfactorily performed his duties for two years. Pasquarelli Aff., ¶ 11.

One of the incentives to employment offered by NJS is an Incentive Stock Option Plan ("ISOP"). This plan gave certain em-

---

1. NJS filed five state law counterclaims against Mullen but has requested dismissal of the counterclaims if its motion for summary judgment is granted. Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("NJS Brief") at 2, n. 2.

2. In connection with this motion NJS submitted: the NJS Brief, Defendant's Reply Memorandum in Support of its Motion for Summary Judgment with attached Exhibits 1–5 ("Reply Brief"), Defendant's Statement of Material Facts Not In Dispute ("NJS Facts"), Affidavit of Robert Lewis with attached Exhibits A–P ("Lewis Aff."), Affidavit of Robert J. Pasquarelli with attached Exhibits A–W ("Pasquarelli Aff."), Affidavit of John R. Sullivan with attached Exhibits A–E ("Sullivan Aff."), Affidavit of Paul Roik with attached Exhibits A–B ("Roik Aff."), Affidavit of Gordon Gilbertson ("Gilbertson Aff."), Affidavit of Adolfo Nogueras with attached Exhibit A ("Nogueras Aff."), and Affidavit of Corrado Gigante with attached Exhibit A ("Gigante Aff."). Exhibits M and N of the Lewis Aff. are selected

portions of the Deposition of Mullen taken on 27 June and 28 June 1989 respectively. The 27 June 1989 transcript will be called 1 Mullen Dep. and the 28 June 1989 transcript will be termed 2 Mullen Dep.

Mullen submitted: Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Opposition Brief"), Affidavit of William P. Mullen ("Mullen Aff."), and Plaintiff's Response to Defendant's Statement of Material Facts Not In Dispute ("Mullen Facts").

3. Mullen requested oral argument but on the day it was scheduled decided it was not necessary. Instead, at oral argument the parties stipulated all that was to be offered was in the record.

4. There was some question of Mullen being able to perform the job without an engineering degree but Mullen's experience convinced NJS such a degree was not necessary. Pasquarelli Aff., ¶¶ 7, 11.

ployees options to purchase stock in NJS. The ISOP was implemented in 1985 and Mullen signed an agreement (the "Option Agreement") on 31 October 1985 allowing him to purchase stock options. Pasquarelli Aff., ¶ 9, Exhibit C.

The Option Agreement provides that:

if the Optionee shall cease to be employed by an Employer Corporation for any reason other than his death or permanent and total disability as defined in Section 22(e)(3) of the Internal Revenue Code of 1954, as amended (the "Code") ("Disability"), as determined by the Board, the Option shall expire coincident with the date of termination, except as and to the extent that the Board may determine otherwise.

Pasquarelli Aff., Exhibit C ¶ 5(a). The Option Agreement also states: "The Option granted hereby shall not impose any obligation on any Employer Corporation to continue the employment of the Optionee." *Id.,* ¶ 14.

While employed by NJS as Vice President of Operations, Mullen was responsible for the operation of the steel plant and control of costs. 1 Mullen Dep. at 156, 174. In this position he was criticized by Pasquarelli, verbally and in writing, over production, maintenance and capital improvement costs. There were large cost overruns on major capital improvements within Mullen's realm of responsibility. 1 Mullen Dep. at 160, 188. Pasquarelli criticized Mullen for these overruns. 1 Mullen Dep. at 165, 191. Mullen was also criticized by Pasquarelli for employee overtime and for failure to adhere to a limit on overtime hours. Pasquarelli Aff., Exhibits D, G and H.

The steel at NJS is produced by melting and mixing various types of scrap metal. There are evidently different qualities and grades of scrap. In order to produce a consistent product the various grades of scrap must be mixed proportionately. Pasquarelli implemented a policy for mixing grades. From time to time Mullen did not adhere to this policy and was criticized by Pasquarelli for this failure. Pasquarelli Aff., Exhibits K, M. Each mixture of met-

al to produce steel is called a heat. Pasquarelli was upset because the heat sizes varied too much for efficient production. Pasquarelli Aff., ¶ 32, Exhibit N.

On numerous occasions, beginning in late December of 1985, Pasquarelli wrote memoranda criticizing Mullen's management abilities, failure to carry out instructions, discrepancies in overtime, failure to convey accurate information and inability to maintain consistent mixtures of scrap and sizes of heats. Pasquarelli Aff., Exhibits D–S. Pasquarelli's memoranda to Mullen were pointed and threatened termination. For example, one memorandum, dated 9 May 1987, stated:

The performance in your areas of responsibility is very bad and is going to result in a catastrophe for New Jersey Steel and its employees.

—the pollution violation on April 14, [is] shocking and inexcusable. The state will shut down the plant!

—the month to date melt shop performance, strictly related to lack of management control, will destroy the stock offering if it continues.

You are letting down the people at New Jersey Steel who you claim to care so much about. I cannot allow this to continue much longer.

Pasquarelli Aff., ¶ 40, Exhibit S.

Mullen agrees Pasquarelli was upset but maintains nevertheless he presided over record production while costs declined. Mullen Aff., ¶¶ 13, 14. Nevertheless, in April of 1987 Pasquarelli told Mullen he should look for another job. 1 Mullen Dep. at 207; Pasquarelli Aff., ¶ 39.

NJS had experienced dangerous and expensive spills of molten steel. During the summer of 1987 the Eccentric Bottom Tapping furnace ("EBT") in which metal is melted was equipped with load cells to enable the operator to gauge how much steel was in the EBT. The load cells, when functioning, told the operator when the EBT could be safely operated. Shortly before 27 July 1987, Pasquarelli "adamantly" told Mullen the EBT was not to be operated without functioning load cells. 2 Mullen

Dep. at 102. In fact, Pasquarelli screamed this order at Mullen. *Id.* at 102–103.

On 27 July 1987 the EBT was in operation without functioning load cells. On that day molten metal spilled and damaged equipment. Prior to the spill, on the morning of 27 July 1987 Mullen was informed that the load cells were not in operation. 2 Mullen Dep. at 100; Mullen Facts, ¶ 55. Mullen nevertheless decided not to shut down the EBT until it had been drained of molten steel. Mullen Aff., ¶¶ 16–19. After Pasquarelli learned of the spill, he asked Mullen if he knew the load cells were not operating. Mullen replied that he did; Pasquarelli immediately fired Mullen. Mullen Aff., ¶ 19. Mullen knew he could be fired. 2 Mullen Dep. at 139, 141; Mullen Facts, ¶ 21. Mullen, however, claims that Pasquarelli agreed to give Mullen until the end of 1987 to improve his performance. 2 Mullen Dep. at 137–144; Mullen Aff., ¶¶ 11–12.

On 27 July 1989 Mullen met with John Sullivan ("Sullivan"), Vice President of Industrial Relations at NJS. Sullivan Aff., ¶ 7. Mullen asked for the same severance terms as a previous employee had received. Mullen Aff., ¶ 20. Mullen sought one year's severance pay and expressed concern about the length of time pay would continue. Mullen Facts, ¶ 60; 2 Mullen Dep. at 117.

As a result of this meeting, on 30 July 1987 Sullivan sent an agreement (the "Severance Agreement") and a letter addendum ("Severance Addendum") to Mullen for his signature. Sullivan Aff., Exhibit B (Severance Agreement) and Exhibit C (Severance Addendum). The Severance Addendum provided for payments of money to Mullen. It also provided for life insurance and an Executive Thrift Program to continue until February of 1988. Severance Addendum, ¶¶ 1–4.

The Severance Addendum also stated:
Stock options not exercised prior to or on July 27, 1987 are considered expired effective July 27, 1987, pursuant to Section 5, page 3 of the Corporation's Incentive Stock Option Plan. Any and all payments made to you as a result of this letter are not to be construed as a continuation of the employment relationship and therefore, you are ineligible to exercise any current or future stock options. *Id.*, ¶ 5. The Severance Addendum went on to state:
The company has no further obligation to you. Any claims you may have against the company, past or present, are released and waived by this agreement. *Id.*, ¶ 6.

Mullen read the entire agreement, including the Addendum and paragraphs five and six. He discussed them with his wife. NJS put no time constraints on how long Mullen had to sign the documents. 2 Mullen Dep. at 120, 128.

On 10 August 1987, Mullen returned to NJS to execute the Severance Agreement. 2 Mullen Dep. at 124; Sullivan Aff., ¶ 12. On 28 August 1987,[5] Mullen wrote to Heinz Frech ("Frech"), an executive in NJS' parent company, to request the Board of Directors of NJS allow him to exercise stock options he had not exercised while with the company. Pasquarelli Aff., Exhibit T. The letter stated, in pertinent part:
This letter is being written, not to complain about, or dispute my discharge but to thank you for the opportunity you gave me. It was a pleasure working with men of your integrity. It is better for New Jersey Steel that I leave at this time because of the conflicts of interest and the communication problems that had developed between Mr. Pasquarelli and myself.

. . . . .

When I was terminated, I was informed that all of my stock options were lost to me. In December of 1986, I became vested for 40% of my options. Due to the abruptness of my discharge and the fact that I was working between 70 to 100 hours a week, I did not have the time to arrange for the financing for my options. I believed that working on the

---

5. In their Statements of Facts, the parties claim the date was in 1989 but common sense and the document state otherwise. *See* NJS Facts, ¶ 69; Mullen Facts, ¶ 69; Pasquarelli Aff., Exhibit T.

project was my first priority and that I would have time in the next few months to buy the stock. I believe that I earned the vested portion of the stock by the way the Mill has performed over the last four years.

In Paragraph 5-A of the Stock Agreement, it states that the Board of Directors could determine whether or not my vested stock options would be honored. Mr. Frech, I believe that I earned the vested portion of my stock and I am hopeful that the Board sees fit to agree.

Pasquarelli Aff., Exhibit T.

The Board of Directors voted to deny the request on 19 November 1987 and informed Mullen of this decision on 7 December 1987. One of the reasons given was that he had been advised prior to termination that stock options should be exercised while employment lasted. Pasquarelli Aff., Exhibit V.

The record demonstrates Mullen was given every opportunity to exercise his options prior to termination. Mullen was advised by Sullivan in June of 1987 to exercise his stock options. Sullivan Aff., ¶ 3; Mullen Aff., ¶ 26. In fact, Sullivan went so far as to recommend a home equity loan in order to finance the purchase and gave Mullen an application for such a loan. Sullivan Aff., ¶ 3. Mullen was never told by any member of the company that after termination he would still be able to purchase stock options. Mullen Facts, ¶ 23. Mullen does not deny Paul Roik ("Roik"), Treasurer of NJS, told him the Option Agreement "meant what it said." Mullen Facts, ¶ 22. Roik also informed Mullen he had to exercise his stock options while employed at NJS. Roik Aff., ¶ 7; 2 Mullen Dep. at 137.

Moreover, Mullen recalls a board meeting where the stock options were discussed and he was told he only had to worry about the stock options if he was going to be terminated. 2 Mullen Dep. at 138. The Option Agreement itself informed Mullen of the dates in which he could exercise his options and that they would cease to be available upon termination of an employee. Pasquarelli Aff., Exhibit C, ¶¶ 4, 5(a). Mullen was aware of his options and that he could be terminated by the company. Indeed, in addition to constant criticism, at one point Pasquarelli advised him to look for another job. Pasquarelli Aff., 39. Also uncontradicted by Mullen is that Pasquarelli told both Gilbertson and Mullen anyone operating the EBT without functioning load cells would be terminated. Pasquarelli Aff., ¶ 47.

NJS fully complied with the Severance Agreement. 2 Mullen Dep. at 126.[6] NJS has no written severance plan and any benefits received by an employee after termination are at the discretion of the company. Pasquarelli Aff., ¶ 49. Mullen received and accepted a total of $67,559 under the Severance Agreement. Pasquarelli Aff., ¶ 57.

On 26 April 1988, Mullen submitted charges of age discrimination with the Equal Employment Opportunity Commission ("EEOC") and the New Jersey Division of Civil Rights ("NJDCR"). Complaint, ¶ 14. In support of the EEOC charge, Mullen submitted an affidavit. Lewis Aff., Exhibit F. This affidavit stated:

> During my employment, Mr. Pasquarelli frequently made age-related remarks to me.
>
> For example, he stated:
>
> A. Oh, hell he's (referring to me) older than dirt.
>
> B. Let him sit down he is the oldest.
>
> C. You go first, your the oldest.
>
> Sometimes statements like these were made in jest by Mr. Pasquarelli.

Lewis Aff., Exhibit F, ¶ 4.

Mullen's charge with the EEOC was investigated by Adolfo Nogueras ("Nogueras") of the Newark area office. Lewis Aff., Exhibit H. Before the EEOC issued

---

**6.** In his Statement of Facts, Mullen denies full compliance with the Severance Agreement by NJS. Mullen Aff., ¶ 32. However, his deposition states: "Whatever it states in that letter they complied to." 2 Mullen Dep. at 126. An affidavit contradicting previous sworn testimony will not create a genuine issue of material fact. *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir.1988).

its determination on Mullen's case, Nogueras wrote to Mullen stating:

> The evidence obtained during the investigation does not support your allegation of age discrimination. You alleged that on July 27, 1987, the above mentioned Respondent [NJS] discharged you because of your age (50). You further alleged that the Respondent did not provide any reason for its decision to terminate your employment.

> The evidence revealed that you were hired by the Respondent as Vice President of Operations on January 15, 1983 at the age of forty-five (45). The record shows you worked in that capacity until July 27, 1987, at which time the Respondent recommended your termination for insubordination and allegedly endangering the safety of plant personnel.

> The record further shows that on or about July 27, 1987, you disobeyed a direct order from your immediate Supervisor and bypassed a safety feature on the company's new electric furnace. In doing so, you needlessly endangered human lives and created a spill of molten metal, destroying some of the newly installed equipment.

> There is no evidence that a similarly situated younger employee replaced you as the company's Vice President of Operations.

> The evidence further disclosed that on or about August 10, 1987, you voluntarily and knowingly executed a waiver of any and all claims you might have had as the result of your employment with the Respondent. It is also noted that you never informed the Commission about signing such a waiver and that you waited approximately 214 days since the date of your discharge and until you received or accrued a total of $67,559.00, to file you change [sic] of age discrimination against the Respondent.

> . . . . .

> In view of the above facts, I have no alternative but to recommend that the Commission issue a determination of no violation of the ADEA statute.

Lewis Aff., Exhibit H; Nogueras Aff., Exhibit A.

In January of 1989 the EEOC made its final determination of Mullen's charges. That report stated:

> The evidence obtained during the investigation revealed that Charging Party [Mullen] was hired as Vice President of Operations on January 15, 1983 at the age of forty-five (45). The record shows that on June 27, 1987, Charging Party was terminated by the company's President and CEO, age forty-one (41) (the same person who hired him). On that date, contrary to the Respondent's [NJS'] specific directive, Charging Party bypassed a safety feature on the company's new electric furnace.

> In doing so, he needlessly endangered human lives and created spill of molten metal destroying some of the newly installed equipment. The record also shows that upon walking into the Melt Shop the company's President and CEO, asked who authorized the operation and Charging Party admitted that he was responsible. The record further shows that immediately after this incident Charging Party was informed that he was being terminated for insubordination and gross negligence.

> There is no evidence which shows that Charging Party's age was a factor on his termination, nor there is [sic] any evidence which prove that Respondent's reason for discharging Charging Party are pretextual.

> The record does not show that Charging Party was treated differently than any younger employees who had violated similar Respondent's [sic] work rules or committed the same violation. Furthermore, there is no evidence indicating that Charging Party was discharged in order to be replaced with a younger individual. The evidence additionally disclosed that three (3) of the five (5) Senior Executives, employed by Respondent, are in the protected age group including one (age 61) who was older than the Charging Party. Based on this analysis, I have determined that the evidence obtained during the

investigation does not establish a violation of the statute.

Lewis Aff., Exhibit I; Gigante Aff., Exhibit A.[7]

On 11 October 1989 the NJDCR, informed of the EEOC's decision, administratively terminated its file on *Mullen v. NJS.* Lewis Aff., Exhibit O. Mullen states the EEOC never contacted him after he submitted his affidavit to them. Mullen Aff., ¶ 31. He does not believe the EEOC "had all of the evidence necessary to determine [his] rights." *Id.*

Of ·the five senior executives at NJS, three (including Pasquarelli) were forty years of age or older. One, the director of sales, was over sixty. Lewis Aff., Exhibit I. Mullen had turned fifty the month before his termination. 2 Mullen Dep. at 86. Following his termination, Mullen's duties were taken over by Pasquarelli. Pasquarelli Aff., ¶ 60. On 18 July 1989 NJS hired Joseph A. Lahita ("Lahita") to assume Mullen's former duties. Lahita was born on 17 November 1945 and so was forty-three years old when hired. *Id.*[8]

On 22 November 1989 Mullen filed this suit in the United States District Court for the District of Pennsylvania. On 7 March 1989 the Honorable Edward Cahn transferred the case to this district.

## II. *Discussion*

### A. Summary Judgment Standard

■ To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'* ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original, citations and footnotes omitted).

■ The Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted): "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (footnote omitted): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e).

*Abrams v. Lightolier, Inc.,* 702 F.Supp. 509, 512 (D.N.J.1988).

---

**7.** Preliminary determinations of the EEOC or portions of its files are admissible as evidence in the trial court's discretion. *Walton v. Eaton Corp.,* 563 F.2d 66, 75, n. 12 (3d Cir.1977);

**8.** Lahita has an engineering degree.

## B. Waiver Analysis

NJS argues Mullen released all claims against it when he signed the severance agreement and then ratified that decision by accepting over $60,000 in benefits. Mullen claims he was under duress and did not knowingly relinquish his rights.

As the Third Circuit has stated: "It is well-established that a release is the giving up or the abandoning of a claim or right to the person against whom the claim exists or the right is to be enforced or exercised...." *In re Bankers Trust Co.*, 752 F.2d 874, 883 (3d Cir.1985). NJS argues that paragraphs five and six of the Severance Addendum are just such a waiver. They state:

5. Stock options not exercised prior to or on July 27, 1987 are considered expired effective July 27, 1987, pursuant to Section 5, page 3 of the Corporation's Incentive Stock Option Plan. Any and all payments made to you as a result of this letter are not to be construed as a continuation of the employment relationship and therefore, you are ineligible to exercise any current or future stock options.

6. The company has no further obligation to you. Any claims you may have against the company, past or present, are released and waived by this agreement.

Severance Addendum, ¶¶ 5 and 6.

### 1. *Waiver of ADEA Claims*

■ ADEA claims may be waived by an employee by signing a release. *Cirillo v. Arco Chemical Co.*, 862 F.2d 448, 449 (3d Cir.1988); *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 518 (3d Cir.1988); *Pears v. Spang*, 718 F.Supp. 441, 445 (W.D.Pa.1989). This waiver must be knowing and willful in order for the waiver to be effective. *Coventry*, 856 F.2d at 518.

■ To determine if a waiver was executed knowingly or willfully, a totality of the circumstances test is applied. *Cirillo*, 862 F.2d at 451. Seven factors are of particular relevance in analyzing the totality of the circumstances:

(1) The clarity and specificity of the release language;

(2) The plaintiff's education and business experience;

(3) The amount of time plaintiff had for deliberation about the release before signing it;

(4) Whether plaintiff knew or should have known his rights upon execution of the release;

(5) Whether plaintiff was encouraged to seek, or in fact received the benefit of counsel;

(6) Whether there was an opportunity for negotiation of the terms of the agreement; and

(7) Whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

*Pears*, 718 F.Supp. at 445; *see also, Cirillo*, 862 F.2d at 451.

■ Analyzing the totality of the circumstances here, Mullen's signing of the Severance Addendum effected a valid waiver of his claims under the ADEA. The release language is not shrouded in legalese. It is a clear statement that all claims "past" and "present" are released against NJS. It is unequivocal and straight forward. The release language is neither hidden within the contract of settlement nor confusing on its face.

The release does state all claims are released but does not, as the waiver in *Pears* did, specifically mention ADEA. It does not mention employment discrimination law as the waiver in *Cirillo* did. In sum, the release is quite clear and unambiguous that all claims against NJS are waived; however it does not specify precisely what these claims might be. Accordingly, to the extent the Severance Addendum is not specific, Mullen's knowledge of his rights under the ADEA must be analyzed in the "totality of the circumstances." His knowledge of these claims can counter any lack of specificity in a clear waiver of claim provision.

The next factor, the employee's education and business experience, is not contested by Mullen. His brief concedes: "Mullen's education and experience certainly would lead one to believe that he was 'competent enough to read and understand its [the release] literal meaning.'" Opposition Brief at 11 (quoting *Coventry*, 856 F.2d at 524). Mullen had many years experience in the steel industry and the record demonstrates he is, at the very least, of average intelligence.

Mullen had worked at NJS for over three years. He was Vice President of the corporation. Employers are required to post notice of the ADEA. 29 U.S.C. 627; *Dreyer v. Arco Chemical Corp.*, 801 F.2d 651, 656 (3d Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519. NJS has complied with all notice posting requirements of the ADEA since at least January of 1984. Sullivan Aff., ¶ 14. Notices of ADEA (and NJLAD) are posted throughout the NJS plant and executive offices. *Id.*, ¶ 15.

Two ADEA notices are kept in locked display panels at the NJS plant. One display panel is inside the personnel office and the other is by a guard house that once served as an entrance for *all* NJS employees. *Id.* Before NJS moved its executive offices, there was a notice posted approximately twenty feet from Mullen's office. *Id.* Moreover, NJS has a handbook which was reviewed and approved by Mullen that states NJS does not discriminate on the basis of age. *Id.*, Exhibit E. Mullen does not dispute any of these facts.

As an officer of NJS who was at the plant for long periods of time, Mullen should have known that the company was prohibited by law from discriminating on the basis of age. He worked at the plant for three years and notices of his rights under the ADEA were posted, one only twenty feet from his office. Moreover, the record shows that Mullen arrived at a conclusion of age discrimination on his own without the aid of counsel. 2 Mullen Dep. at 89. The inescapable conclusion is that Mullen knew or should have known older employees were legally protected by the ADEA.

The opportunity to negotiate and reflect on an agreement is an important factor in determining whether ADEA rights have been surrendered. *See Cirillo*, 862 F.2d at 451. Mullen contends, "John Sullivan and I did not negotiate a severance agreement." Mullen Aff. ¶ 20. The uncontested facts belie this statement, however. Mullen concedes he asked for the same severance terms a previous employee had received. *Id.;* 2 Mullen Dep. at 117.

Also uncontested is that Mullen met with Sullivan on two occasions to discuss the severance agreement. He met with Sullivan first on 28 July 1987, the day after Mullen was fired. They met again when Mullen returned to NJS on 10 August 1987 at which time Mullen signed the agreement. Mullen Facts ¶ 68.

Sullivan did not have an agreement ready for Mullen to sign on their first meeting. At that meeting Mullen "took issue" with and questioned Sullivan on the length of severance. 2 Mullen Dep. at 121. Sullivan brought the agreement he had discussed with Mullen to Pasquarelli for approval. Sullivan Aff. ¶ 9. Sullivan then had to reduce the Severance Agreement to writing and mail it to Mullen. *Id.* ¶ 11. Mullen concedes Sullivan did not hand him a paper ready to sign but had to wait for it to arrive by mail. 2 Mullen Dep. at 119. (attached as Exhibit 1 to Reply Brief).

After receiving the Severance Agreement Mullen read the entire document including the Severance Addendum. *Id.* at 120. Mullen states: "[M]y wife and I went through them and read them, and sat down, and talked about them." *Id.* He and his wife discussed the Severance Agreement for some time. *Id.* at 122. Mullen then returned to NJS more than a week later to sign the documents. He was not forced to sign the Severance Agreement and he does not remember having any objections to any portion of it after it was reduced to writing. *Id.* at 120, 122.

The uncontested record reveals Mullen presented his demands to NJS and questioned at least one provision of the agree-

ment. NJS considered his objections and sent Mullen a proposal. He discussed it with his wife and thought about it for over a week. Mullen does not recall having or voicing any objection to the Severance Agreement after he received it. He then returned to NJS and signed the document. The elements of negotiation and reflection were present and the facts in the case *sub judice* track *Cirillo* and *Pears* closely. As well, Mullen was aware or should have been aware of his rights at the time he signed the Severance Agreement.

In *Cirillo*, where the Third Circuit upheld a waiver of ADEA rights, the employee was given a form to sign and was never given an opportunity to state what he wanted in a retirement package. *Id.*, 862 F.2d at 449–50. Here, drawing all inferences in favor of Mullen, he had two opportunities to speak with Sullivan; he told Sullivan what he wanted in a benefit package; he was sent a benefit package after his meeting with Sullivan. Mullen read the Severance Agreement and discussed it with his wife. Finally, he signed the document and received its benefits. This is not the situation where the employer had a form on the desk ready to be signed. Under these circumstances, the third and sixth *Coventry* factors, time to deliberate and opportunity to negotiate, counsel for waiver. *See Cirillo*, 862 F.2d at 454, n. 4; *Pears*, 718 F.Supp. at 4446; *Pierce v. Chesapeake Corp.*, No. 88–1361 slip op. at 6 (E.D.Pa. 24 Oct. 1989) (1989 WL 127503).

Another factor in determining whether waiver of ADEA rights is whether the employer urged the employee to seek counsel. *Coventry*, 856 F.2d at 524. This element is not dispositive on the issue of waiver, however. *Cirillo*, 862 F.2d at 454; *Pears*, 718 F.Supp. at 466. Here, NJS did not encourage Mullen to seek counsel. Significantly, however, NJS did not discourage such a move and placed no time constrictions on him allowing him to seek counsel if he wished.

The last *Coventry* factor, whether benefits provided by agreement exceeds those Mullen was entitled to, clearly points toward waiver. NJS has no termination

package for employees. Pasquarelli Aff., ¶ 49. Mullen was told unemployment compensation was available to him and that certain insurance would still be provided him. Sullivan Dep. at 86–87 (Reply Brief, Exhibit 3). Although Mullen had some benefits available, neither his contract nor law entitled him to the benefits, totalling in excess of $60,000, that he received.

In *Cirillo*, the court stated:

A final factor provides support for the finding of the district court that Cirillo executed a knowing and voluntary waiver. The special allowance given to Cirillo and accepted by him in exchange for his Release exceeded the employee benefits to which he was already entitled by $84,251.62. Accordingly, we find unpersuasive Cirillo's argument that his waiver was unsupported by consideration and thus not enforceable. The record is clear that unless Cirillo signed the Release, he would not receive the additional money, but that his ordinary retirement benefits would be unaffected by whether he signed the Release.

*Id.*, 862 F.2d at 454–455 (footnote omitted).

In *Cirillo*, the employee would receive his normal benefit package but could receive more by signing a release. In *Coventry*, however, the employee could either sign the waiver or get nothing, not even severance benefits. As the court stated:

We note first in that regard that the decision with which Hallas was presented in his meetings with Yost and with Wilson appears to have been little more than a "Hobson's choice." Hallas testified that he was advised by Wilson that his only options were accepting the mutual option pension benefits, and foregoing his claims, or being placed on automatic lay-off and losing his income and hospitalization benefits immediately. Moreover, in light of USS's policy of denying severance benefits to persons who were "otherwise eligible" for a pension plan, Hallas could *not opt to have his employment terminated completely* and take severance benefits.

*Coventry*, 856 F.2d at 524 (citations omitted) (emphasis added).

Mullen's situation is different. NJS had already terminated him. It could not hold him in limbo, between pension benefits or lay-off without severance benefits. He could receive unemployment compensation and what few benefits were due him and keep his causes of action or could take the Severance Agreement benefits, to which he had no legal right, and forego any claims against NJS. He chose the latter course.

Mullen asserts he was under economic duress and feared loss of his house and car. Mullen Aff., ¶ 23. However, any pressure he felt did not come from NJS. The Third Circuit in *Cirillo* stated such claims are insufficient to demonstrate duress:

> Moreover, as Cirillo concedes, economic pressure alone is insufficient to establish a claim of duress that would void an otherwise valid release. *See e.g., Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885 (3d Cir.1975). Rather, the rule followed by this court is that "one asserting duress must establish a wrongful act or threat which prevented a party from exercising his free will and judgment." *Plechner v. Widener College, Inc.*, 569 F.2d 1250, 1261 (3d Cir.1977). Consistent with that precedent, the court in *Coventry* held that the waiver was executed under duress because it had been a product of a termination policy that contravened the ADEA. In the court's view, the employer's policy which denied severance benefits to all who were qualified for a retirement pension constituted "a wrongful act" sufficient to support a claim of duress. Thus, *Coventry's* economic dilemma was not the sole basis for the court's finding that the release was not voluntarily executed.

*Id.*, 862 F.2d at 452 n. 2.

Mullen claims he did not knowingly release his claims against NJS. Mullen Aff., ¶ 23. He claims it was a "time of trauma and duress" in his life. 2 Mullen Dep. at 126. At his deposition Mullen made the following statements as to the waiver provisions of the Severance Addendum:

> Q. Do you have any understanding today of what this language about any claims you have against the company are released and waived means?
>
> A. I know what the company would like it to mean, but it doesn't mean the same thing to me.
>
> Q. What does it mean to you?
>
> A. Since I—when I signed that, I was under such duress, it was at such a quick time, that I don't feel as though that means anything to me.

2 Mullen Dep. at 127–128.

Such subjective feelings concerning the unambiguous language in a release are insufficient to support a claim that the release was not understood. As the court in *Cirillo* stated:

> These arguments are unpersuasive. We find the text of the Release straightforward, clear, and specific. It releases all claims that an employee may have against the company "as a result of this termination" and specifically notes that it "does not have any effect on any claim ... unrelated to this termination." "Termination" in this context is not at all ambiguous. Moreover, the Release itself was presented to the employees in a manner and context that signalled the importance of the matter, explained the nature of the claims that would be released, and counselled mature consideration with the help of an attorney. As a result, we find the Release and its presentation well designed to communicate effectively the consequences of accepting a special allowance. Indeed, if the document provided to Cirillo were found to be an inadequate predicate for an effective waiver, we would be hard pressed to prescribe an adequate one.
>
> Even if we accept that Cirillo in fact understood the Release as not addressing any claims arising from his firing, we must conclude that such a misguided subjective belief, without more, is insufficient to defeat summary judgment in the face of clear and unambiguous language. A contrary conclusion would undermine the utility of the voluntary settlement process.

*Id.*, 862 F.2d at 452–453. *See also, Pears*, 718 F.Supp. at 446–447 (rejecting claims of

ignorance of commonly used words in testimony on meaning of release clause). Here the Severance Agreement and Addendum are straightforward. The sole reason for the Severance Agreement and Addendum is the termination of Mullen by NJS. The circumstances surrounding the negotiation, presentation and execution of the Severance Agreement and Addendum are not ambiguous. The seven factors noted in *Cirillo*, as applied here, and the totality of the circumstances demonstrate a knowing, voluntary waiver of ADEA claims by Mullen.

### 2. *Section 10(b)*

Count IV of Mullen's complaint charges that NJS violated section 10(b) of the '34 Act. Mullen contends NJS intentionally and fraudulently made untrue statements and omitted to state material facts in connection with the purchase and sale of stock options. NJS asserts these claims were waived by the Severance Agreement along with Mullen's ADEA claims.

 Mullen responds that 15 U.S.C. § 78cc(a) voids any understanding or agreement which waives rights under section 10(b). Opposition Brief at 11 (citing *Jones v. Miles*, 656 F.2d 103 (5th Cir.1981).[9] However, this provision concerns waiver of future violations; there is a distinction between a waiver of future claims and a waiver of mature claims of which the releasing party had knowledge. *Leff v. CIP Corp.*, 540 F.Supp. 857, 862 (S.D.Ohio 1982).

As one court stated:

The federal securities laws do not compel persons harmed by acts violating provisions of the laws to seek their remedies only through litigation. Notwithstanding the provisions of the securities laws expressly voiding any private agreement waiving compliance with provisions of the laws, settlements of claims arising from acts which are violations of the securities laws are not void as a matter

of law, at least where such settlement agreements do not themselves continue the precise conduct which violates the laws. But judicial hostility toward waivers of statutory rights requires that the right to private suits extended by the securities laws for alleged violations be scrupulously preserved against unintentional or involuntary relinquishment. Courts can scrutinize the settlement agreement to determine whether the waiver of private rights accomplished thereby is intentional.

*Murtagh v. University Computing Company*, 490 F.2d 810, 816 (5th Cir.1974) (footnote and citations omitted), *cert. denied*, 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 62 (1974); *see Blessig v. Struthers Dunn*, No. 85–1362, slip op. (31 July 1985 E.D.Pa.).

Mullen's stock options vested in 1985. He was aware of them; there is no question he knew of their availability. Therefore, he was able to effect a waiver and indeed he did. The Severance Addendum is unambiguous. It reads:

Stock options not exercised prior to or on July 27, 1987 are considered expired effective July 27, 1987, pursuant to Section 5, page 3 of the Corporation's Incentive Stock Option Plan.

Severance Addendum, ¶ 5.

This paragraph is consistent with the Option Agreement. Mullen's actions subsequent to signing the Severance Agreement are consistent with a knowledge of the import of its meaning. Mullen wrote to Frech asking him if the Board of NJS would consider allowing him to exercise the options. He was unsuccessful but his letter clearly shows Mullen was aware that only the board had the power to grant him such rights he no longer possessed them because of his termination. Pasquarelli Aff., Exhibit T.

### 3. *Wrongful Discharge and Breach of Contract Claims*

 The Third Circuit rejected applying ordinary contract principles to waiver of

9. 15 U.S.C. § 78cc(a) states, in pertinent part: Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or

regulation thereunder, or of any rule of an exchange required thereby shall be void. *Id.*

claims under the ADEA. *Coventry,* 856 F.2d at 522. In so doing the court recognized that the test for waiver under contract principles was less rigorous than that applicable to the ADEA. *Id.* at 522–23. Barring unusual state law, then, a release sufficient to waive ADEA claims necessarily waives state claims under contract law.[10]

New Jersey follows traditional contract principles on release of actionable claims. Such a contract can be freely entered into and absent fraud or other compelling circumstances a court should enforce it. *Aponte v. Williard,* 229 N.J.Super. 490, 493, 551 A.2d 1054 (App.Div.1989). There is no fraud or duress here and so waiver is effective on the wrongful discharge and contract claims. Even if the release had not been effective when signed, Mullen's acceptance of the benefits of the Severance Agreement and failure to complain until all checks had been delivered would ratify the contract. *See Client's Sec. Fund v. Allstate Ins. Co.,* 219 N.J.Super. 325, 333–334, 530 A.2d 357 (App.Div. 1987); *Clarkson v. Selected Risks Insurance Co.,* 170 N.J.Super. 373, 379–380, 406 A.2d 494 (Law.Div.1979); *American Photocopy Equipment Co. v. Ampto, Inc.,* 82 N.J.Super. 531, 538–39, 198 A.2d 469 (App. Div.), *cert. denied,* 379 U.S. 842, 85 S.Ct. 80, 13 L.Ed.2d 47 (1964). Therefore, Mullen waived his common law claims.

### C. Substantive Law Analysis

#### 1. *ADEA*

Even if the Severance Agreement did not effect waiver of Mullen's claims under the ADEA, section 10(b) and the state claims, summary judgment is appropriate.

---

**10.** Both the Severance Agreement and Option Agreement were executed in New Jersey. The Option Agreement specifies New Jersey law. The parties do not dispute New Jersey law applies.

**11.** The Circuit in *Bruno* stated: "Congress has defined the protected class to include only those people between forty and seventy years of age. 29 U.S.C. § 631(a)." 882 F.2d at 765. However, section 631(a) states: "The prohibitions of this chapter ... shall be limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

The ADEA prohibits employers from terminating any employee over forty years of age because of age. *Bruno v. W.B. Saunders Co.,* 882 F.2d 760, 765 (3d Cir.1989),[11] *cert. denied,* —— U.S. ——, 110 S.Ct. 880, 107 L.Ed.2d 962 (1990). Plaintiffs can demonstrate discrimination through direct evidence or circumstantial evidence which raises a presumption of discrimination. *Maxfield v. Sinclair International,* 766 F.2d 788, 791 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986).

The burden of production in an ADEA case shifts between the parties three times. The burden is first on the plaintiff to make out a *prima facie* case of age discrimination. *Siegel v. Alpha Wire Corp.,* 894 F.2d 50, 53 (3d Cir.1990). This requires proof that plaintiff establish he (1) belongs to a protected class, (2) applied for and was qualified for the job, (3) was rejected despite his qualifications and (4) was replaced by a person sufficiently young to raise the inference of age discrimination.[12] *Id.* Because the *prima facie* case is easily proven, it is "rarely the focus of the ultimate disagreement." *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1214 n. 1 (3d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989).

If a plaintiff proves the existence of a *prima facie* case of age discrimination, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory business reason for the allegedly discriminatory employment practice. *Fowle,* 868 F.2d at 61. If the defendant meets its burden of production, the plaintiff must produce evidence to show the proffered reason for the defendant's con-

---

(West 1989 Pocket Part) Public Law 99–592 § 2(c)(1) struck out "but less than seventy years of age" which previously followed "forty years of age." *See Gorniak v. National R.R. Passenger Corp.,* 889 F.2d 481, 489–90 n. 2 (3d Cir.1989) (Garth, J., dissenting).

**12.** The fourth element of the *prima facie* case can be satisfied even if plaintiff's replacement is within the protected class (over forty) as long as he is younger than plaintiff. *Maxfield,* 766 F.2d at 792.

duct is merely pretext for age discrimination. *Id.; See generally, Siegel,* 894 F.2d at 53–54; *Healy,* 860 F.2d at 1214; *Spangle v. Valley Forge Sewer Auth.,* 839 F.2d 171, 173 (3d Cir.1988); *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 202 (3d Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988); *Chipollini v. Spenser Gifts,* 814 F.2d 893, 897 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). The burden of persuasion, however, is on and remains with the plaintiff.

 The plaintiff need not have direct evidence of age discrimination. *Chipollini,* 814 F.2d at 897. The plaintiff may show "the employer's proffered explanation is unworthy of credence." *Fowle,* 868 F.2d at 62; *Chipollini,* 814 F.2d at 898. In the context of a summary judgment motion,

> the court should ... consider[ ] whether evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge reasonably *could* support an inference that the employer did not act for nondiscriminatory reasons, not whether the evidence *necessarily* leads to that conclusion that the employer did act for discriminatory reasons.

*Chipollini,* 814 F.2d at 900 (emphasis in original).

 NJS asserts Mullen has failed to make a *prima facie* case of age discrimination because his replacement was within the protected class and because Mullen was not qualified for the position. NJS Brief at 24. Drawing all reasonable inferences in favor of Mullen, this argument is without merit. NJS, however, has come forward with a multitude of legitimate, nondiscriminatory reasons for Mullen's termination. From early in January of 1986 until Mullen's termination on 27 July 1987, a number of memoranda were sent by Pasquarelli to Mullen.

On 24 January 1986 Pasquarelli forwarded a memorandum to Mullen which attacked procedures used to record scrap mix. Pasquarelli Aff., Exhibit I. On 6 May 1986 Pasquarelli again sent a memorandum to Mullen on scrap mix stating, "I am looking for immediate, not gradual results. The mix should conform to my memo starting today, May 6, and every day for the balance of the month." *Id.,* Exhibit J. The next day, 7 May 1986, another memorandum was sent to Mullen deploring inefficiencies in scrap mix and stating: "The situation is obviously out of control and reflects total disregard for the clear instructions that were issued yesterday." *Id.,* Exhibit K.

In October of 1986, Pasquarelli wrote to Mullen in his own hand across a print-out of various heat sizes: "How much longer are you going to tolerate this horse—performance? The meltshop has not run well since July. I am personally about out of patience." *Id.,* Exhibit L. In November of 1986 Pasquarelli wrote to Mullen stating that only "gross stupidity" or "gross insubordination" could cause certain problems with heat sizes. *Id.,* Exhibit N. On 20 February 1987 yet another sternly worded memorandum was sent by Pasquarelli to Mullen stating scrap mixes must be consistent. *Id.,* Exhibit N.

> On 6 January 1987 Pasquarelli wrote: I don't want to hear that the high level of overtime is the result of Holidays in December since I assume you knew that there were Holidays in December when you made the budget.
>
> This situation reflects a total lack of control on the part of management. Drastic steps must be taken to immediately bring this overtime to within the budgeted levels.

Pasquarelli Aff., Exhibit D. Pasquarelli followed this memorandum with another sharply worded memorandum about overtime on 7 January 1986. *Id.,* Exhibit E. This matter was still unresolved on 12 March 1986 and Pasquarelli sent all supervisors another memorandum. *Id.,* Exhibit F. On 16 May 1986 overtime was still not under control and Pasquarelli sent yet another memorandum to Mullen cancelling anymore overtime.

On 25 February 1987 Pasquarelli sent another handwritten note to Mullen stating that by rehiring an employee previously terminated Mullen had "undone the first

positive step you [Mullen] have taken in two years.... Just remember I am holding you personally responsible." *Id.*, Exhibit P.

There were other problems Pasquarelli perceived with inaccurate information on equipment wear and high carbon content in the steel. *Id.*, Exhibits Q, R. In May of 1987, two months before Mullen's termination, Pasquarelli wrote to Mullen and stated:

> The performance in your areas of responsibility is very bad and is going to result in a catastrophe for New Jersey Steel and its employees.
>
> —the pollution violation on April 14, [is] shocking and inexcusable! The State will shut down the plant!.
>
> —the month to date melt shop performance, strictly related to lack of management control, will destroy the stock offering if it continues.
>
> You are letting down the people at New Jersey Steel who you claim to care so much about.
>
> I cannot allow this to continue much longer.

*Id.*, ¶ 40, Exhibit J.

Finally, on the day he was fired, Mullen operated the EBT knowing the load cells were inoperable.[13] He did not consult with Pasquarelli on this decision although he was aware Pasquarelli was "adamant" about that safety precaution. 2 Mullen Dep. at 102. Upon learning of the spill and Mullen's knowledge of the malfunctioning load cells, Pasquarelli fired him immediately.

Nonetheless, Mullen claims NJS's reasons are pretext. In order to demonstrate NJS's "proffered explanation is unworthy of credence," *Fowle*, 868 F.2d at 62, Mullen sets forth the following: (1) During his fifteen year friendship and business relationship with Pasquarelli, Pasquarelli made age related references to Mullen, often in jest. However, Mullen concedes he could not recall a time they were not made in jest. 2 Mullen Dep. at 99. (2) The May letter from Pasquarelli did not make sense because April and May were record production months; and (3) From 1982 through 1986 Mullen was responsible for more than tripling production while reducing production costs to all time lows at NJS. Mullen Aff., ¶¶ 13–14.

Mullen fails to create a genuine issue of material fact on the pretext of NJS's reasons for his termination. He was not the oldest employee of NJS. There is no evidence of other older NJS employees being terminated. Mullen has not contradicted Pasquarelli's sworn affidavit that NJS' standing policy was to terminate any party

---

**13.** Mullen states in his affidavit that he was not told the EBT "was to be *shut down* if the load cells were not functioning." Mullen Aff., ¶ 15 (emphasis added). However, this does not create a genuine issue of material fact. At his deposition, Mullen stated:

> I realized the first time that he [Pasquarelli] was fairly adamant about it when he stopped in my office and told me he had just seen Gordy Gilbertson, and told him to *shut down if the load cells didn't work, and that's the way we were going to operate*, screaming at me in that manner.

2 Mullen Dep. at 102–103 (emphasis added).

A party cannot defeat a motion for summary judgment merely by producing an affidavit that conflicts with his deposition testimony. *Merrell Dow*, 851 F.2d at 706. In *Merrell Dow*, the plaintiff, in order to defeat a motion for summary judgment, submitted an affidavit directly contradicting her sworn deposition testimony concerning drugs she took while pregnant. The Third Circuit stated:

> When, as in the present case, the affiant was carefully questioned on the issue, had access to the relevant information at the time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a *genuine* issue of material fact.

*Id.* (emphasis in original).

There is no difference between the situation in the case *sub judice* and *Merrell Dow*. This is not the case of an uneducated, inarticulate individual making two conflicting statements almost contemporaneously. *See Joseph v. Hess Oil*, 867 F.2d 179, 183–183 (3d Cir.1989). Mullen was quite clear in his deposition about the virulence of Pasquarelli's orders prior to the spill of steel. He was carefully questioned about this and several other incidents.

Mullen uses the term "functioning" in his affidavit and "working" in his deposition. *Compare* Mullen Aff., ¶ 15 *with* 2 Mullen dep. at 102, 103. There is no ascertainable difference in meaning of the words in context and Mullen uses them interchangeably. *See* Mullen Aff., ¶ 17.

responsible for operating an EBT without load cells and that Mullen knew this. Pasquarelli Aff., ¶ 47.

The EEOC's determination after investigation which found no fault with NJS stated:

There is no evidence which shows that [Mullen's] age was a factor on his termination nor there is [sic] any evidence which prove that [NJS'] reason for discharging Mullen are pretextual.

The record does not show that [Mullen] was treated differently than any younger employees who had violated similar [NJS'] [sic] work rules or committed the same violation. Furthermore, there is no evidence indicating [Mullen] was discharged *in order* to be replaced with a younger individual.

Gigante Aff., Exhibit A. Mullen has produced nothing to counter this determination except to say "I do not believe the EEOC had all of the evidence necessary to determine my rights." Mullen Aff., ¶ 31.[14]

Pasquarelli's comments on age were to the effect that Mullen "was older than dirt." Pasquarelli also sometimes stated "let him sit down he's the oldest" or "you go first your the oldest." Lewis Aff., Exhibit F, ¶ 4. Pasquarelli states, and Mullen nowhere denies, these comments were often made in response to comments made by *Mullen* about his or someone else's age. Pasquarelli Aff., ¶ 59. Mullen admits the comments were made in jest. 2 Mullen Dep. at 99.

Nothing in the record suggests anything but two middle-aged men bantering over seniority. Such innocuous comments by old friends of roughly the same age do not create a genuine issue of material fact. *See, e.g., Price Waterhouse v. Hopkins,* — U.S. ——, 109 S.Ct. 1775, 1804–5, 104

L.Ed.2d 268 (O'Connor, J., concurring) (1989) ("Race and gender always 'play a role' in an employment decision in the benign sense that there are human characteristics of which decisionmakers are aware and may comment on in a perfectly neutral and non-discriminatory fashion"); *Gagne v. Northwestern Nat. Ins. Co.,* 881 F.2d 309 (6th Cir.1989) (comment that company needed "younger blood" insufficient to create issue of material fact under ADEA).[15]

Similarly, Mullen's other refutations do not raise a genuine issue of material fact. Increasing production and decreasing costs from 1982 to 1986 does not rebut the claims of NJS that costs could have been lower but for problems in Mullen's sections of responsibility. Mullen asserts reasons why Pasquarelli's orders or explanations were not met but does not demonstrate that the reasons NJS sets forth for firing him were pretext. Mullen Aff., ¶¶ 5–19.

Specifically, Mullen's claim that in his judgment the EBT should not have shut down until the steel had been drained from it does not alter the fact that Pasquarelli's orders were disobeyed by Mullen. Nothing in the record indicates Pasquarelli terminated Mullen for anything other than Mullen's failure, for whatever reason, to shut down the EBT and previous unsatisfactory performance.

Mullen's statements that April and May were record production months for NJS are not inconsistent with Pasquarelli's May memorandum expressing concern that the state would shut down the plant for environmental violations. Pasquarelli Aff., Exhibit S. Indeed, ignoring health and environmental regulations may decrease cost and increase production, until these lapses are discovered. Mullen's claims of increased production are not inconsistent

---

**14.** Mullen does state he never received a communication from the EEOC to discuss NJS' contentions. Presumably this includes the Nogueras Letter. *Compare* Mullen Affidavit, ¶ 31 *with* Nogueras Affidavit.

**15.** Mullen claims *Blum v. Witco Chemical Corp.,* 829 F.2d 367 (3d Cir.1987) requires such comments to create a genuine issue of material fact. However, although the facts there demonstrate a supervisor stated: "Gee whiz, Mr. Blum your

getting feisty at your old age," the main evidence was statistical. Significantly, the Court in *Blum* relied entirely on statistics and did not even mention the comment in finding the evidence sufficient to uphold a violation of the ADEA. The Court did not rely on the supervisor's comment but on statistics to find Blum had rebutted the employer's proffered non-discriminatory reasons. *Id.,* 829 F.2d at 372–73.

with Pasquarelli's complaints of excessive overtime and violations of safety procedures by Mullen.

Mullen proffers nothing to rebut the claim of NJS of nondiscriminatory reasons for his termination. He was terminated by an old friend who knew his age when he hired him. He was replaced by Lahita, a man in the protected age group only seven to eight years his junior who possessed an engineering degree which Mullen did not.

Pasquarelli's growing irritation with Mullen's performance in the year and a half preceding his termination is clear from the record. Mullen acknowledges this dissatisfaction but claims the problems were not his fault. Mullen Aff., ¶¶ 5–19. The inquiry under ADEA concerns pretext "and is not an independent assessment of how [the court] might evaluate and treat loyal employees." *Healy*, 860 F.2d at 1216. The ADEA does not permit "judicial second-guessing of business decisions" and "is not intended to transform the courts into personal managers." *Id.* (quoting *Thornbrough v. Columbus and Greenville Railroad Co.*, 760 F.2d 633, 647 (5th Cir.1985)).

At most, Mullen has raised an issue of fact over whether the problems at NJS should have been laid at his feet. That is not the inquiry, however. The record demonstrates his employer was unsatisfied with his performance generally, blamed him for the spill of molten steel specifically and terminated him for these reasons. The ADEA creates liability for age discrimination, not business judgment which the plaintiff contends is wrong or questionable. Nothing in the record raises a genuine issue of material fact as to the validity of NJS' non-discriminatory termination of Mullen.[16]

### 2. Section 10(b)

■ To succeed on a section 10(b) claim a plaintiff must establish (1) a false representation of (2) a material (3) fact, (4) defendant's knowledge of its falsity and his

intention to rely on it, (5) the plaintiff's reasonable reliance on it and (6) his resultant loss. *Zlotnick v. TIE Communications*, 836 F.2d 818, 821 (3d Cir.1988).

■ Mullen has not met this standard. The record is devoid of any statements by NJS that Mullen could receive stock options after he was fired or that Mullen was told, or believed he could not be fired. Mullen's affidavit contains the statement:

> No one at NJS ever said to me that if I was discharged I would not be able to exercise my stock options. In fact, I relied on the provision in the Agreement that states that the Board of Directors of NJS could permit me to exercise my options regardless of my employment status.

Mullen Aff., ¶ 4.

This statement does not create a genuine issue of material fact. In point of fact, no one at NJS ever told Mullen he could exercise the option after he was discharged. Significantly, the Option Agreement states: "the Option shall expire coincident with the date of termination, except as and to the extent that the Board may determine otherwise." Pasquarelli Aff., Exhibit C, ¶ 5(a). If Mullen relied on the Option Agreement as he says, he knew his option expired when he was terminated. Indeed Mullen's letter to Frech acknowledged "the board could determine" whether he would be allowed to purchase the stock. *Id.*, Exhibit T. There is nothing to demonstrate Mullen was told he could purchase stock after termination. The Option Agreement states the contrary. His affidavit on this point is of no moment. There is also no evidence in the record of any other NJS employee exercising stock options after termination.

Mullen asserts he attended a dinner meeting at which the ISOP was raised. The date of the meeting is unclear. Mullen states there was discussion, by unnamed persons, about termination and stock options. The questions and answers were

---

**16.** The NJLAD applies the same three part *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) test that is applicable in ADEA claims. *Andersen v. Exxon Co.,* 89 N.J. 483, 492, 446 A.2d 486 (1982).

Therefore, as Mullen has failed to raise an issue of material fact as to pretext in his ADEA claim, summary judgment is also appropriate on the NJLAD claim. *Id.* at 492–93, 446 A.2d 486.

only vaguely remembered by Mullen but to the effect that if an employee was not concerned about being fired he need not worry about losing his stock option. 2 Mullen Dep. at 138. Such a statement was neither false nor misleading and is based on the Option Agreement. Mullen points to no false representation by NJS.

In 1985, Mullen spoke with Roik, who was evidently unsure as to what the termination provisions of the Option Agreement were. 2 Mullen Dep. at 135. In 1987 Mullen spoke to Roik again and Roik told Mullen the termination agreement "meant what it said." 2 Mullen Dep. at 136–137. Nonetheless, Mullen did not believe this statement was accurate because he felt Roik "was in the same boat I [Mullen] was" and didn't know the true policy. 2 Mullen Dep. at 137.

None of this creates a genuine issue of material fact as to a false statement of material fact or reliance. Mullen states that throughout his employment he knew he could be fired. 2 Mullen Dep. at 139. Mullen knew that an employee could always be terminated, and stated: "There is no guarantee that you will not lose your job. I don't know too many companies that give you that guarantee." Id. at 141. Nobody ever told Mullen he could not be fired.

Indeed, the record is replete with warnings of his employer's clear displeasure with Mullen's performance and warnings of impending termination. On 7 October 1986 Pasquarelli sent Mullen a letter stating Pasquarelli was "personally about out of patience" with Mullen's performance. Pasquarelli Aff., Exhibit L. Shortly thereafter, Pasquarelli stated that a failure to follow his instructions could only be caused by "gross stupidity" or "gross insubordination." Pasquarelli Aff., Exhibit N.

On 25 February 1987 Pasquarelli attacked Mullen's decision to retain an unsatisfactory employee. He wrote: "Just remember I am holding you personally responsible." Id., Exhibit P. Pasquarelli's letter of 9 May 1987 warned Mullen: "You are letting down the people at New Jersey Steel who you claim to care so much about. I cannot allow this to continue much longer." Id., Exhibit S. Earlier, in April Pasquarelli told Mullen to look for another job while he was on vacation. Id., ¶ 39.[17]

Finally, shortly before he was fired Sullivan told Mullen "his job was in grave jeopardy," and "termination was imminent." Sullivan Aff., ¶ 2.

In addition to being warned about termination, Mullen was also given every opportunity to exercise his stock options. Sullivan told him in June to exercise them and even advised Mullen on how to finance such a purchase. Sullivan Aff., ¶ 3. Roik warned Mullen he had to exercise his options while employed at NJS. Roik Aff., ¶ 7; 2 Mullen Dep. at 137. The Option Agreement itself informed Mullen of the dates his rights became vested and that they ceased to be available upon termination. Even at the board meeting Mullen recalls where stock options were discussed it was intimated that terminated employees cannot exercise stock options.

---

**17.** Mullen states in his affidavit Pasquarelli agreed he would keep his job until the end of 1987. Mullen Aff., ¶ 12. However, an examination of Mullen's deposition reveals that Pasquarelli never said Mullen would be retained until the end of 1987. Upon questioning about the April conversation, Mullen stated the following:

> A. I believe I said that, "wait until the end of the year, and if you're not happy at the end of the year, I'll resign."
>
> Q. What did he respond to that, what did he say?
>
> A. He just kind of nodded his head, and that was the end of the conversation.
>
> Q. When you mean nodded his head, what do you mean, how did he nod his head?
>
> A. He didn't talk to me any more about my performance being poor or say that that's not good, I'm not going to give you 'till the end of the year. I left the room *assuming* that I had 'til the end of the year to straighten this whole thing out.

2 Mullen Dep. at 5–6 (emphasis added).

This testimony does not demonstrate any statement by Pasquarelli that Mullen would not be fired until the end of 1987. To the extent Mullen's deposition contradicts his affidavit it is controlling. *See Merrell Dow*, 851 F.2d at 706. In any case, the Pasquarelli correspondence subsequent to April and Mullen's meeting with Sullivan clearly informed Mullen he could be fired at any time. Indeed, that was always Mullen's understanding. 2 Mullen Dep. at 139, 141.

Under these circumstances, unambiguous contractual language, a clear statement by the Treasurer of NJS that the Option Agreement "meant what it said" and no statement by NJS or understanding by Mullen that he could not be fired, there is no genuine issue of material fact as to, at least, a false representation of material fact and reasonable reliance by Mullen. Any understanding by Mullen that termination did not affect stock options was clearly unreasonable given the record.[18]

### 3. Common Law Claims

Mullen claims that NJS discharged him in order to prevent his purchase of stock. As has already been noted, NJS has put forward many legitimate, non-discriminatory reasons for Mullen's termination. Mullen has failed to come forward with any evidence suggesting these reasons are pretextual. There is not a scintilla of evidence that NJS had any problem with Mullen purchasing stock while he was employed by NJS, or that NJS terminated him to prevent a purchase of stock. Mullen became vested with stock option rights in 1985. He could have purchased stock at any time. NJS did not discourage Mullen from purchasing stock. Indeed, many employees of NJS advised Mullen to exercise the options before he was terminated. There is no basis in the record for a claim of wrongful discharge.[19]

Mullen's breach of contract claim is difficult to discern. He claims the Option Agreement was breached. Apparently, the only basis for this claim is that Mullen was terminated and NJS did not grant him an exception to purchase stock.

The Option Agreement is clear that if the optionee, Mullen, is terminated "the option shall expire coincident with the date of termination, except as and to the extent the Board may determine otherwise." Pasquarelli Aff., Exhibit C, ¶ 5(a). The Option Agreement also makes clear that it imposes no obligation on NJS to continue to employ any holder of a stock option. Id., ¶ 14.

Mullen was terminated. He had not exercised his rights. The Board of NJS did not grant an exception to the rule. None of this breaches the Option Agreement. Summary judgment is granted on this claim.

Conclusion

For the foregoing reasons, the motion of NJS for summary judgment is granted and all claims against it are dismissed. NJS' counterclaims against Mullen are dismissed without prejudice.

---

**18.** NJS argues that *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3d Cir.1988) (en banc), *cert. denied sub nom. Vitiello v. Kahlowsky & Co.*, —— U.S. ——, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988) creates a one year cause of action for civil suits brought under section 10(b). NJS claims Mullen knew of any claim he had on 28 August 1987, when he wrote to Frech, but did not file suit until 21 November 1988.

However, drawing all inferences favorable to Mullen, he did not categorically know he would be denied the stock options until NJS informed him of its decision on 7 December 1987. He, therefore, meets the statute of limitations.

**19.** Even if Mullen proved NJS terminated him from his employment to prevent his acquiring stock, he might not have a cause of action under New Jersey law. New Jersey law does not imply an implied covenant of good faith in an at-will employee situation. *Brunner v. Abex Corp.*, 661 F.Supp. 1351, 1356 (D.N.J.1986). The at-will employee must come forward with a public policy that his termination violated to create liability. *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 72, 417 A.2d 505 (1980).