289 N.J. Super. 531 (1996)
674 A.2d 603
JAMES G. KEELAN, PLAINTIFF-APPELLANT,
v.
BELL COMMUNICATIONS RESEARCH, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 13, 1996.
Decided April 11, 1996.
*534 Before Judges KING, KLEINER and HUMPHREYS.
Peter Van Schaick argued the cause for appellant.
Roger J. Karlebach argued the cause for respondent.
The opinion of the court was delivered by KLEINER, J.A.D.
This appeal involves two issues: (1) when does the statute of limitations commence to bar a claim under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8; and (2) when is a release of such a claim valid.
Plaintiff James G. Keelan filed a complaint under CEPA on November 30, 1994. Plaintiff and 750 other workers received written notification on September 23, 1992 that their employer, defendant Bell Communications Research, Inc., intended to implement a "force adjustment" effective December 2, 1992, and that their employment with defendant would terminate on that date.
*535 With his notice of termination, plaintiff received a proposed form of release. He was advised that in exchange for an executed release, he would receive a termination allowance of $41,000 less appropriate deductions, six months of paid medical benefits, and outplacement services to assist him in locating new employment. Plaintiff was specifically advised, "If you are eligible, you will receive your service pension regardless of whether you sign the Release Agreement or not." Plaintiff executed the release on November 2, 1992. Thereafter, he received his termination allowance.
Plaintiff's complaint alleged that he was included in the group of employees being terminated because he had conscientiously opposed defendant's failure to protect the safety and health of employees working in one of defendant's facilities from the hazards of poisonous gases used in a research laboratory and for raising other safety-related issues. Defendant moved for summary judgment, contending that plaintiff's claim under CEPA was untimely filed and, alternatively, that plaintiff was not entitled to damages because he had executed a general release. Plaintiff cross-moved for partial summary judgment, contending that the release contravenes public policy and is unenforceable as a matter of law.
The motion judge denied plaintiff's cross-motion and granted summary judgment to defendant. The judge concluded that the one-year limitations period of N.J.S.A. 34:19-5 commenced September 23, 1992, when plaintiff was notified of his impending employment termination. Plaintiff's complaint, filed November 30, 1993, was consequently deemed barred by the statute of limitations. The judge, relying upon our decision in Swarts v. The Sherwin-Williams Co., 244 N.J. Super. 170, 581 A.2d 1328 (App. Div. 1990), alternatively concluded that the release was voluntarily executed and also barred plaintiff's claim.
Plaintiff appeals both conclusions of the motion judge. We find that the one-year limitations period under N.J.S.A. 34:19-5 commenced to run on December 3, 1992, when plaintiff's employment *536 with defendant ceased, and that plaintiff's complaint therefore was filed timely. We also conclude that genuine material issues exist as to the voluntariness of the release. Those issues precluded a grant of summary judgment. See Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 523, 666 A.2d 146 (1995); Rosenberg v. Rosenberg, 286 N.J. Super. 58, 68, 668 A.2d 84 (App.Div. 1995).

I
Plaintiff was employed as Staff Manager for Environmental Health and Safety for defendant. In this capacity, he was responsible primarily for safety and health at the Building III site at Navesink. From 1985 to 1992, plaintiff pressed his superiors to address and correct safety concerns pertaining to the use of toxic gases in Building III.
In late 1991, an outside consultant found that "highly toxic, poisonous and unstable gases are being used in Building III and the areas are not protected in accordance with the high hazard criteria. Table 306.2.1 specifically prohibits use of poisonous gases except in high hazard areas."
In early 1992, defendant's Director issued an annual job-performance evaluation ranking plaintiff as "needing improvement" on 10 out of 13 measures of "team work." In response to this unfavorable evaluation, plaintiff filed a whistleblower complaint (a complaint under the Conscientious Employee Protection Act) with defendant's Manager of Corporate Security, alleging that he was being harassed because of his safety work. Plaintiff alleged that for the next several months, defendant's internal process for resolving his whistleblower complaint "whitewashed the misconduct by defendant's mismanagement." In May 1992, plaintiff and the Director reached an agreement under which plaintiff refrained from further pursuing his internal CEPA claim. In return, the Director agreed they would work together constructively to resolve any future safety concerns on plaintiff's part.
Later in 1992, Bell conducted a major force reduction. On September 23, 1992, plaintiff was notified both orally and in *537 writing that his job would be eliminated effective December 2, 1992. The notice also informed plaintiff that he could apply for termination benefits consisting of a termination allowance of $41,000 less appropriate deductions, six months' company-paid medical benefits, and outplacement services (force adjustment benefits) to help him locate new employment. The notice specified that to be eligible for termination benefits, plaintiff had to sign and return the release agreement attached to the notification. Defendant contends that the written notification made clear that termination benefits were not an entitlement but constituted new and separate consideration. The notification stated, "If you are eligible, you will receive your service pension regardless of whether you sign the Release Agreement."
Plaintiff charges that his inclusion in the force reduction was merely a pretext giving defendant the chance to terminate his employment. Plaintiff stated, "The only reason I could see why I was selected for termination was to retaliate against me for voicing my safety concerns." Plaintiff also contends that he told several co-employees that he was being terminated in retaliation for conscientiously opposing unsafe practices. Shortly thereafter, he claims that he was threatened with immediate discharge if he was not quiet. Plaintiff also claims that he tried to appeal defendant's termination decision but was told that no internal company appeal was possible.
Plaintiff discovered that the release form which was provided to him was incomplete, as the second page, which required his signature, was missing. At plaintiff's request, he was provided with a second page but was given only seven days to sign it. Defendant claims that plaintiff signed the release the same day he received the missing second page. Thereafter, plaintiff received the promised severance package and his employment terminated. On November 30, 1993, plaintiff filed his complaint.

II
The CEPA provides in pertinent part:

*538 An employer shall not take any retaliatory action against an employee because the employee does any of the following:
a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law;
b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer or another employer with whom there is a business relationship; or
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law;
(2) is fraudulent or criminal; or
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
[N.J.S.A. 34:19-3.]
In its motion for summary judgment, defendant conceded that the activities for which plaintiff claims he was discharged were whistleblowing activities within the purview of N.J.S.A. 34:19-3a to c. The primary question presented to the Law Division was whether plaintiff's CEPA claim was time-barred.
N.J.S.A. 34:19-5, in part, provides:
Upon a violation of any of the provisions of [CEPA], an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction.
N.J.S.A. 34:19-2e specifically defines "Retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment."
The policy behind CEPA was articulated by Governor Thomas Kean in the news release issued when he signed it into law on Monday, September 8, 1986:
It is most unfortunate  but, nonetheless, true  that conscientious employees have been subjected to firing, demotion or suspension for calling attention to illegal activity on the part of his or her employer.
It is just as unfortunate that illegal activities have not been brought to light because of the deep-seated fear on the part of an employee that his or her livelihood will be taken away without recourse.

*539 [Office of the Governor, News Release at 1 (Sept. 8, 1986) (cited in Abbamont v. Piscataway Bd. of Educ., 138 N.J. 405, 418, 650 A.2d 958 (1994)).]
Defendant did not take "other adverse employment action ... in the terms and conditions" of plaintiff's employment. Defendant did not alter any of the terms or conditions of plaintiff's employment, but rather terminated him effective at a future date. Defendant's action severed all terms and conditions of plaintiff's employment. Nor did defendant merely suspend or demote or transfer plaintiff. Defendant's retaliatory action, then, consisted of plaintiff's actual "discharge."
Citing Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391, 397 (1992), plaintiff argues that this court must presume that the Legislature said what it meant and meant what it said in N.J.S.A. 34:19-3. In Germain, the United States Supreme Court reiterated the universal canon of statutory construction that unambiguous statutory language must be read according to its plain meaning. Ibid. The definition of retaliatory action speaks in terms of completed action. Discharge, suspension or demotion are final acts. "Retaliatory action" does not encompass action taken to effectuate the "discharge, suspension or demotion." We therefore find no retaliatory action until plaintiff's actual discharge.
We are cognizant that in an academic setting, the denial of tenure, and not the subsequent date when the employment ceased, invokes the running of the statute of limitations as to any claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and 42 U.S.C. § 1981. Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); Chardon v. Fernandez, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981). However, we are mindful that the Title VII cases have concluded that the decision not to grant tenure is a distinct employment action. As noted in the dissent of Justice Stevens in Chardon, commenting upon Ricks:
The majority held merely that the denial of tenure in the academic setting is fundamentally different from a notice of discharge; it is a distinct and separate *540 employment action, with important and far reaching consequences for all aspects of the employee's status. While denial of tenure is often followed by discharge, it is not always, and the consequences of denial of tenure are not dependent on its being followed by discharge. The Court found that Ricks' complaint was based on the denial of tenure, which was effective immediately; it followed, therefore, that the limitations period began as soon as Ricks received notice of that action. Here, plaintiffs complain of discharges and demotions, not of any distinct event that occurred on an earlier date. The letters notifying them of the planned actions were notice and nothing more; they were not actions in themselves comparable to the denial of tenure.
[Chardon, supra, 454 U.S. at 12, 102 S.Ct. at 31, 70 L.Ed.2d at 11.]
We find the distinction discussed by Justice Stevens persuasive in our analysis. This is particularly so in view of the language of N.J.S.A 34:19-3, which focuses upon discharge as a retaliatory act.
We must also take care not to read CEPA in a way that would undermine its expressed goals. The Supreme Court, in Abbamont v. Piscataway Bd. Educ., 138 N.J. 405, 650 A.2d 958 (1994), likens CEPA to "a civil rights statute." Justice Handler stated:
CEPA must be considered "remedial" legislation and therefore should be construed liberally to effectuate its important social goal. Judiciary, Law and Public Safety Committee, Statement on Assembly Bills No. 2872, 2118, 2228 (1990) (indicating that "the remedies available under the `whistleblower' act are to be liberally construed"); see also Sabella v. Lacey Township, 204 N.J. Super. 55, 59, 497 A.2d 896 (App.Div. 1985) (noting that remedial statutes must be liberally construed)....
[Id. at 431, 650 A.2d 958.]
CEPA provides only a one-year statute of limitations. Commencing the statute of limitations at an earlier date contravenes the concept that CEPA is remedial legislation that should be liberally construed. The motion judge's conclusion that plaintiff's cause of action accrued when he received written notification of defendant's future intent to terminate his employment effectively shortens the period in which plaintiff could file his complaint. The decision disregards the fact that from September 23, 1992 to December 1, 1992, plaintiff was still gainfully employed by defendant. During that period of time, plaintiff had the opportunity either through direct contact with supervisory personnel or by a demonstration of loyalty or excellent work performance to persuade defendant that its decision was unwise. We conclude that *541 plaintiff's cause of action accrued on the date of actual discharge. Plaintiff's complaint was therefore timely filed on November 30, 1993.

III
As an alternative basis for granting summary judgment to defendant, the motion judge concluded that the release that plaintiff signed barred his CEPA claim. In reaching that conclusion, the judge cited Swarts v. The Sherwin-Williams Co., 244 N.J. Super. 170, 581 A.2d 1328 (App.Div. 1990). In Swarts, we adopted the totality-of-the-circumstances test used by federal courts to determine the validity of an employee's release of claims against his employer. Id. at 177, 581 A.2d 1328. We reasoned,
[G]iven the statutory goal, the validity of a waiver or release of a claim under the NJLAD must be made with considerations. What those careful considerations are is unsettled in our law. Accordingly, we turn to federal decisional law as a guide for standards appropriate for evaluating a waiver of an unlawful discrimination claim.
[Id. at 176, 581 A.2d 1328.]
In Swarts, we reviewed federal authority and noted that the Circuits were then split on the proper standard for a valid release of an unlawful discrimination claim. Id. at 176-77, 581 A.2d 1328. We adopted the standard that we considered more solicitous of employees' interests: "In light of the public goal of the NJLAD, we find the totality of the circumstances the more persuasive and appropriate standard." Id. at 177, 581 A.2d 1328. Swarts also adopted a list of six nonexhaustive factors delineated by the Third Circuit, Coventry v. United States Steel Corp., 856 F.2d 514, 524 (3rd Cir.1988), to determine whether an employee's release of ADEA claims was knowing and voluntary:
1) the plaintiff's education and business experience, 2) the amount of the time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.
[Swarts, supra, 244 N.J. Super. at 177, 581 A.2d 1328 (quoting Coventry, supra, 856 F.2d at 523).]
*542 We also indicated, "Additional factors to be considered are (1) whether an employer encourages or discourages an employee to consult an attorney and (2) whether the employee had a fair opportunity to so." Ibid. (citing Bormann v. AT & T Communications, Inc., 875 F.2d 399, 403 (2d Cir.1989), cert. denied, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989); Cirillo v. Arco Chemical Co., 862 F.2d 448, 454 (3d Cir.1988)). The United States Court of Appeals and the United States District Courts in our Circuit have applied the totality-of-circumstances test to employee waivers, using these factors. See, e.g., Cirillo, supra, 862 F.2d at 454; Martinez v. National Broadcasting Company, 877 F. Supp. 219, 227 (D.N.J. 1994); Ponzoni v. Kraft General Foods, 774 F. Supp. 299, 314 (D.N.J. 1991), aff'd, 968 F.2d 14 (3d Cir.1992); Mullen v. New Jersey Steel Corp., 733 F. Supp. 1534, 1543 (D.N.J. 1990); McBriarty v. American Telephone & Telegraph Company, 1990 WL 10338, [*]3, 52 Fair Empl.Prac.Cas. (BNA) 58 (D.N.J. 1990) (not reported in F. Supp.); Pears v. Spang, 718 F. Supp. 441, 445 (W.D.Pa. 1989). Cf. W.B. v. Matula, 67 F.3d 484, 497 (3d Cir.1995) (using many of same factors to determine validity of release of claim under Individuals with Disabilities Education Act (IDEA)).
The motion judge reviewed each of the Swarts factors and concluded that there existed no genuine issue of material fact and that plaintiff's release satisfied the totality-of-the circumstances test adopted in Swarts. In determining that conclusion anew, we must
[c]onsider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
[Brill v. Guardian Life Ins. Co. of America, supra, 142 N.J. at 523, 666 A.2d 146.]
We initially note that plaintiff has admitted in his brief on appeal that he is well-educated and that he was encouraged to consult with an attorney before signing the release. Accordingly, we first turn our attention to the other factors discussed in Swarts.
*543 In evaluating the clarity and specificity of the language of the release, we may compare the release used here with the release in Swarts. In Swarts, the release under scrutiny, which we upheld, contained lengthy sentences. In fact, one sentence contained 130 words. We note that the release provided to plaintiff contains no sentence with more than fifty words. Most of the sentences are under thirty words. The release does not contain legal terminology or arcane vocabulary. Additionally, the release terms are not inconspicuously placed within the document. Cf. Cook v. Buxton, Inc., 793 F. Supp. 622, 625 (W.D.Pa. 1992) (finding significant that the release consisted of only four lines of text buried in the middle of a two-page document and was not otherwise made visible by the employer).
In evaluating clarity, one question which may be asked is whether objectively the ordinary employee would know of his rights upon execution of the release. Certainly, a release executed by an employee who is unaware of his rights is not a knowing or voluntary release. Plaintiff contends that the release is unenforceable because it fails to mention the CEPA claim specifically and consequently fails to apprise plaintiff of his rights. Plaintiff finds support for that argument by referring to the Older Workers Benefit Protection Act (OWBPA), 29 U.S.C. §§ 621-634. The motion judge found the OWBPA to be inapplicable.
President Bush signed the OWBPA into law on the same day Swarts was handed down, resolving the Circuit split on validity of employee releases of ADEA claims and adding additional criteria for a valid release. The OWBPA provides, in pertinent part:
(f)(1) An individual may not waive any right or claim under this Chapter [the ADEA of 1967, 29 U.S.C. § 626] unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum 
(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
(B) the waiver specifically refers to rights or claims arising under this Act;
(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

*544 (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled; (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or
(ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of, at least 45 days within which to consider the agreement;
(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired; ....
[29 U.S.C. § 626(f)(1).]
We disagree with plaintiff's reliance on this Act. OWBPA, by its own terms, does not govern the validity of releases of CEPA claims. OWBPA clearly and unambiguously states that "An individual may not waive any right or claim under this chapter" unless the release meets the listed criteria. Ibid. (emphasis added). The Act referred to in the OWBPA is the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 626, not the New Jersey Conscientious Employee Protection Act.
In evaluating the necessity that the release specifically refer to the CEPA claim, we note the U.S. Court of Appeals for the Fifth Circuit recently rejected the argument that an employee release was invalid because it failed to name the federal employee-protection statute on which the employee sought to base his claim, the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. § 2101-2109. The court reasoned:
Williams contends that the releases were invalid because they did not mention WARN. This argument is meritless. There is no obligation under WARN or the common law for the defendants to mention WARN for the releases to be valid. The releases stated that they included all claims relating to the "time of my employment or to my layoff...." WARN applies to layoffs and the releases addressed all claims related to the plaintiffs' layoffs; thus, the releases barred WARN claims.
Williams v. Phillips Petroleum Co., 23 F.3d 930, 936 (5th Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 582, 130 L.Ed.2d 497 (1994). Accord Fair v. International Flavors & Fragrances, Inc., 905 *545 F.2d 1114, 1117 (7th Cir.1990) (general release barred ERISA claim without specific mention of ERISA).
However, federal courts in our Circuit have held that although employers are not absolutely obligated to mention a specific statute in order to validly bar claims under that statute, the failure to make such specific mention is detrimental to the employer's case that the release is valid. See, e.g., Cook, supra, 793 F. Supp. at 624; Ponzoni, supra, 774 F. Supp. at 310; Pears, supra, 718 F. Supp. at 445-46. Given the peculiar importance of CEPA in protecting whistleblowers' rights and thereby ensuring public health and safety, defendant's failure to mention CEPA claims by name and the effect, if any, upon the issue of whether the release was knowing and voluntary, raised a material issue which should have precluded a grant of summary judgment.
Another Swarts factor pertains to time: "the amount of time the employee had possession of or access to the release for the purposes of deliberating before signing it." Plaintiff received the first page of the two-page release on September 23, 1992. Defendant was given forty-five days to sign the release. Plaintiff requested the missing second page of the release on November 2, 1992, seven days prior to the November 9, 1992 deadline.
The second page of the release form contains the following:
WHO IS BOUND
I am bound by this Release. In addition, anyone who succeeds my rights and responsibilities, such as my heirs or the executor of my estate, is also bound. This Release is made for Your benefit and all who succeed to Your rights and responsibilities, such as Your successors and assigns and the heirs or the executor of Your estate.
REVIEW
I acknowledge that I was given this Release form at least forty-five (45) days prior to the date I was asked to sign it, and that I was advised to use the 45 days to consult with an attorney of my choosing, prior to signing it. I also acknowledge that I understand that this Release does not become effective until seven (7) days after I sign it, and unless agreed to by Bellcore. I also acknowledge that within this seven-day period I may revoke this Release and that if I revoke this Release or Bellcore does not agree to it, it will become null and void and, I will not receive a termination allowance. I also understand that should I choose not to revoke this Release within the seven (7) day period, and Bellcore agrees to the terms of this *546 Release, the Release will then become effective and that Bellcore will then pay me the termination pay allowed when my employment with Bellcore terminates.
SIGNATURES
I have read, understand, and voluntarily agree to the terms of this Release.
EMPLOYEE SIGNATURE: ____ DATE: ____
The motion judge in his review of the "time factor" stated:
It is clear that Page 2 of the release didn't add anything other than the signature page and release of  of the heirs rights. In other words, the major content  contents of the release were stated on Page 1. In any event, he had that  that Page 2 sufficient time to  to look at it before making a decision.
We disagree. Page two of the release does contain an important contractual term applicable to plaintiff's heirs in the event of his death. Moreover, page two contains an important acknowledgment that plaintiff had forty-five days to review the entire release document. Clearly, plaintiff had forty-five days to review page one of the release. He had only seven days to review page two. Although CEPA does not require that an employee be given forty-five days to review a release before executing the document, that period is clearly relevant in an evaluation of the broader question of whether plaintiff voluntarily and knowingly executed the release. Defendant argues that the letter dated September 23, 1992 covered much of the same information that is included within the release. Although defendant's contention is correct, the letter did not contain any reference to the contractual provision pertinent to the binding effect of the release on plaintiff's heirs.
The fact that defendant gave plaintiff the second page of the release well after the first page does not automatically preclude a finding that the release was knowing and voluntary. However, that question cannot be answered summarily. Swarts held that eight days was enough time for the employee there to review the release for purposes of an LAD waiver. 244 N.J. Super. at 178-79, 581 A.2d 1328. Swarts, however, is countered by Cook v. Buxton, Inc., supra, 793 F. Supp. at 624-26, in which the Western District of Pennsylvania held that ten days was insufficient time to deliberate for a knowing and voluntary waiver of *547 employment claims. We conclude that the effect, if any, that the shorter period of possession of page two of the release had upon plaintiff's decision to sign the release after he received the second page is a material fact that requires determination after a plenary hearing.
The third factor in Swarts concerns the role of the employee in deciding the terms of the release. This factor is not specifically discussed in Swarts but is specifically discussed in Coventry. This prong of the totality test is met when the employee has the opportunity to negotiate, regardless of whether he actually attempts to do so. See Coventry, supra, 856 F.2d at 524-25. See also Cirillo, supra, 862 F.2d at 454 n. 4; Ponzoni, supra, 774 F. Supp. at 312 (holding that plaintiff never sought to discuss or negotiate, he did not establish oppressive atmosphere and so absence of actual negotiation was not strong indicator that release was unknowing or involuntary). Here, Keelan had several conversations with Human Resources Specialist Kieran Kole. Compare Mullen, supra, 733 F. Supp. at 1544-45, wherein the employee had an opportunity to negotiate because he had two meetings with his boss, one the day after he was terminated, when he requested severance and the second when he signed the release. The record includes Kole's affidavit, which states, "Other employees did make requests for changes and some of those requests were granted." We agree with the motion judge that plaintiff had the opportunity to negotiate the terms of the release.
The sixth and last Swarts factor is "whether the consideration given for the release and accepted by the employee exceeds the benefits to which the employee was entitled by contract or law." Plaintiff contends that his termination package was no more generous than that offered to any other employee who signed a release, even though those employees had no CEPA claim. This is not grounds for holding that the release was unknowing and involuntary or for otherwise invalidating the release. Neither contract nor law entitled plaintiff to the benefits which he received for signing the release. Defendant's cover letter accompanying *548 the release clearly emphasized that these benefits were separate from and in addition to those to which terminated employees were already entitled: "If you are eligible, you will receive your service pension regardless of whether you sign the Release Agreement or not." In short, plaintiff's acceptance of the release entitled him to consideration above and beyond that to which he was entitled absent the release, not to consideration above and beyond what other terminated employees received for signing the release.
Summarizing our decision on this point, we hold that some but not all of the Swarts factors raise material issues of fact which preclude the granting of summary judgment.

IV
Plaintiff contends that the release is unenforceable, as it was signed under duress. In support of that contention, plaintiff contends that he was under extreme pressure, as he had recently been divorced and had purchased a home and was in severe financial difficulty. While those factors may be grounds for personal sympathy for plaintiff, economic pressure alone is not enough to constitute duress rendering an otherwise valid release void. See, e.g., Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885 (3d Cir.1975); The Adonis, 38 F.2d 743, 744 (3d Cir.1930); Killian v. McCulloch, 873 F. Supp. 938, 943 (E.D.Pa. 1995); Reed v. SmithKline Beckman Corp., 569 F. Supp. 672, 674 (E.D.Pa. 1983).
However, plaintiff also contends that his supervisor threatened him with immediate termination if he did not cease discussing his CEPA claim with other employees. Immediate termination would have deprived plaintiff of any opportunity to accept the benefit package promised by defendant. The nature and extent of the alleged threat by plaintiff's supervisor and the effect that the threat had upon plaintiff's decision to execute the release is material to the broader question of whether there was a knowing and voluntary execution of the release.
*549 Summary judgment was improperly granted.[1] Reversed.
NOTES
[1] We need not address plaintiff's numerous references and arguments predicated upon OWBPA. As we noted, we have concluded that OWBPA is inapplicable to an analysis of the efficacy of the release of CEPA claims.