Nancy RIDDELL, Plaintiff,

v.

MEDICAL INTER–INSURANCE
EXCHANGE, Defendant.

No. CIV. A. 98–2482 (MLC).

United States District Court,
D. New Jersey.

Oct. 14, 1998.

Elizabeth Zuckerman, Zuckerman & Fisher, Lawrenceville, NJ, for Plaintiff.

Vanessa M. Kelly, Jackson, Lewis, Schnitzler, & Krupman, Morristown, NJ, for Defendant.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on motion of defendant, Medical Inter–Insurance Exchange, for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated, defendant's motion is denied.

## BACKGROUND

The central issue of this motion concerns the validity of a release signed by a terminated employee. Plaintiff Nancy Riddell ("Riddell") worked as a customer service representative for defendant Medical Inter–Insurance Exchange ("MIIX") from March 25, 1996, to January 16, 1998. (Compl. ¶ 3.) Riddell alleges that she often worked in excess of 40 hours per week for no additional compensation. (Id. ¶ 5.) In October 1997, Riddell began experiencing back problems, caused by two herniated disks. (Id. ¶ 6.) Riddell went on short-term disability leave on December 5, 1997, and returned to work on January 16, 1998. (Id. ¶ 9.) Upon returning, Riddell met with Ron Wade, ("Wade"), Vice President of Underwriting, and Nancy Gowaty, ("Gowaty"), Assistant Vice President of Human Resources. (Aff. of Nancy Riddell in Opp'n to Def.'s Mot. for Summ. J. ("Riddell Aff.") ¶ 6.) Wade informed Riddell that her position had been eliminated and that her services were no longer needed. (Id. ¶ 7.) Riddell claims that her job duties were later assigned to a younger woman. (Id. ¶ 9.)

Riddell alleges that MIIX: (1) failed to pay her 1.5 times her regular hourly wage for each hour she worked in excess of 40 hours per week in violation of N.J.S.A. § 34:11–56a4, (Compl., Count One); (2) failed to reinstate Riddell upon her return from medical leave in violation of the Family and Medical Leave Act, ("FMLA"), 29 U.S.C. § 2601, et seq., (id., Count Two); (3) committed age discrimination under the New Jersey Law Against Discrimination, N.J.S.A. § 10:5–12 et seq., ("NJLAD"), by terminating Riddell and assigning her job duties to a younger woman, (id., Count III); (4) committed disability discrimination under NJLAD by terminating Riddell, (id., Count IV); and (5) failed to recall Riddell for a position in violation of both FMLA and NJLAD. (Id., Count V.)

Defendant MIIX has moved for summary judgment, seeking dismissal of Riddell's Complaint in its entirety. MIIX asserts that all of Riddell's claims are barred by her signing a release ("Release") of all claims against MIIX at the January 16, 1998 meeting. (Def.'s Br. in Supp. of Mot. for Summ.

J. ("Def.'s Br. in Supp.") at 5.) Gowaty provided Riddell with a two-page memorandum explaining the severance package and containing the Release. (Riddell Aff. ¶ 6.) The first six items referred to the particulars of Riddell's severance package. (*Id.*, Ex. A) The Release was listed as item seven and read:

> Please countersign a copy of this memorandum thereby confirming your acceptance of the severance package. You signature will also signify a release of any and all claims which you may have against MIIX and their respective present and former directors, officers, employees and agents regarding your employment, the elimination of your position and severance. The benefits contained in the severance package will be implemented as soon as we receive your countersigned copy of this memorandum.

(*Id.*)

Riddell acknowledges that she read the Release, but alleges that she did not understand that signing the Release could result in a waiver of claims that she might have under laws concerning overtime wages or age and disability discrimination. (Riddell Aff. ¶¶ 2, 6.) Riddell also claims that she believed that if she did not sign the Release, she would be unable to collect unemployment benefits. (*Id.* ¶ 6.) Riddell alleges that she was given only a few minutes to review the document and never had an opportunity to negotiate its terms. (*Id.* ¶ 7.)

In contrast, defendant MIIX asserts that Riddell understood her rights under the Release. MIIX also claims that Riddell and Gowaty negotiated the issue of vacation pay, leading to the inclusion of vacation pay in the severance package. (Gowaty Aff. ¶ 4.) MIIX submits a copy of the Release which includes handwritten notes allegedly by Gowaty calculating the number of vacation days due Riddell and adding to the Release: "Pay any vacation due employee in final paycheck." (*Id.*, Ex. A.) Riddell does not recall discussing the issue of vacation pay and submits a copy of the Release that does not contain handwritten notes. (Riddell Aff. ¶ 7.)

MIIX also argues that Riddell ratified the Release by accepting the benefits of the severance package. (Def.'s Br. in Supp. at 9–10, Def.'s Ltr. Br. in Reply ("Def.'s Reply Br.") at 4–5.) According to MIIX, Riddell cannot challenge the Release while retaining the benefits. (Def.'s Reply Br. at 5.) Riddell responds by stating that she should not have to "tender back" her severance benefits because doing so would undermine the remedial nature of the various statutes under which she brings her claims. (Pl.'s Br. in Opp'n at 15.) In addition, Riddell states that it would be impractical to require her to return her benefits, because it· is impossible to determine what portion of the benefits, if any, was in consideration for the Release and what portion constituted normal severance benefits. (*Id.* at 15–16.)

## DISCUSSION

### I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial. *Id.* at 324, 106 S.Ct. 2548. "By its very terms, the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are only those facts that might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir.1991).

The role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citation omitted).

## II. *Release of a Claim under the Family Medical Leave Act*

Employees may waive claims arising under Title VII, 42 U.S.C. § 2000e *et seq.*, and under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, ("ADEA"). *See Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII); *Coventry v. United States Steel Corp.*, 856 F.2d 514 (3d Cir.1988) (ADEA). *But see Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) (holding that an employee cannot waive claims pursuant to the Fair Labor Standards Act, ("FLSA"), 29 U.S.C. §§ 206–209). The parties have not cited any published opinion addressing whether an employee may validly waive claims under the FMLA by signing a release, nor are we aware of any. However, neither party disputes that claims under FMLA can be waived, and we have no reason to hold otherwise. *See generally Coventry*, 856 F.2d at 521 n. 8 (discussing the rationale for allowing waiver of ADEA claims but not FLSA claims). Accordingly, we will apply those legal principles concerning releases which have developed in the context of Title VII and ADEA cases.

An employee cannot waive an ADEA or Title VII claim unless the waiver is made "knowingly and willfully." *See Coventry*, 856 F.2d at 522. In the context of a waiver of an ADEA claim, the Court of Appeals for the Third Circuit created a seven factor test for deciding if a release is knowing or voluntary under the "totality of the circumstances." *See Cirillo v. Arco Chemical Co.*, 862 F.2d 448, 451 (3d Cir.1988). Congress then changed the relevant criteria under the ADEA by passing the Older Workers Benefit Protection Act, ("OWBPA") in 1990. *See* 29 U.S.C. § 626(b). Employer releases must now meet specific requirements in order to constitute a valid waiver of ADEA claims. *Id.*

Both parties assume that we will apply the "totality of the circumstances" test in the instant case. While this approach has been superceded by the OWBPA with respect to releases of ADEA claims, we nonetheless conclude that the "totality of circumstances" test should be used to determine whether releases are valid under the FMLA. The test has been used by this Court to determine the validity of a release of a Title VII claim. *See Martinez v. NBC*, 877 F.Supp. 219, 227 (D.N.J.1994); *see also Bennett v. Independence Blue Cross*, No. 92–4249, 1993 WL 15603 (E.D.Pa. Jan.13, 1993) (unpublished opinion) (applying test to Title VII, ERISA, and ADEA claims); *Morris v. Penn Mutual Life Ins. Co.*, No. 87–7063, 1989 WL 14063 (E.D.Pa. Feb.21, 1989) (unpublished opinion) (applying test to Title VII claim). New Jersey state courts have also adopted the Third Circuit test. *See Swarts v. Sherwin–Williams Co.*, 244 N.J.Super. 170, 177, 581 A.2d 1328, 1332 (App.Div.1990) (adopting the test for evaluating releases under the NJLAD).

Under the totality of the circumstances test, a court should address, but is not limited to, the following factors when determining the validity of a release:

(1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

*Cirillo,* 862 F.2d at 451. We will now address each factor to determine whether Riddell knowingly and voluntarily waived her right to sue under the FMLA.

### A. Clarity and Specificity of Release Language

The language of the Release is straightforward and plaintiff acknowledges that it is written in plain English. *See* (Pl.'s Br. in Opp'n at 5) (conceding that the Release is in "plain English"); *see also Mullen v. New Jersey Steel Corp.,* 733 F.Supp. 1534, 1544 (D.N.J.1990) (noting that release is not shrouded in legalese). The Release is also not buried at the bottom of a long contract. *See Mullen,* 733 F.Supp. at 1544. We observe, however, that the Release was not set apart from the other information describing the severance benefits. (Riddell Aff., Ex. A.); *see also Cirillo,* 862 F.2d at 452 (noting that the release was set aside in a manner that showed its importance).

The absence in the Release of any reference to specific claims that are being waived by Riddell also diminishes its clarity. *Cf. Cirillo,* 862 F.2d at 452 (noting that the release clearly explained the nature of the claims that would be released); *Ponzoni v. Kraft General Foods, Inc.,* 774 F.Supp. 299, 310 (D.N.J.1991) (same); *Bennett,* 1993 WL 15603, at *2 (unpublished opinion) (same); *Cook v. Buxton,* 793 F.Supp. 622, 625 (W.D.Pa.1992) ("We find that the failure to include language which specifically addresses ADEA or laws prohibiting employment discrimination significantly diminishes the weight of this factor in defendant's position."). Accordingly, we find that this factor does not weigh significantly in favor of either party.

### B. Education and Experience of Plaintiff

MIIX alleges that Riddell is skilled at analyzing complex insurance contracts and consequently had the ability to understand the significance of the Release. (Def.'s Br. in Supp. at 6.) Riddell responds that her work was mainly clerical and that she lacks a college education. (Riddell Aff. ¶¶ 2, 3.) Riddell's employment application reveals that she has taken college courses and worked as an underwriter with a previous employer. (Gowaty Aff., Ex. B.)

Riddell is not as educated as some of the plaintiffs found to have executed a valid release. *See Cirillo,* 862 F.2d at 453 (finding that plaintiff was a "well-educated man"); *McBriarty v. AT & T,* No. 88–5139, 1990 WL 10338, at *3 (D.N.J. Feb.5, 1990) (finding that plaintiff is "well-educated"); *Ponzoni,* 774 F.Supp. at 310 (noting that plaintiff was a very highly educated man with doctorate degrees). Riddell's education and experience, however, do give her some ability to understand an appropriately worded release. *See Ponzoni,* 774 F.Supp. at 310 (stating that education and experience is a minimal threshold); *Pears v. Spang,* 718 F.Supp. 441, 446 (W.D.Pa.1989) (finding plaintiff's high school diploma and attendance at a one-year secretarial school constituted sufficient education and experience to execute a release); *Bennett,* 1993 WL 15603, at *3 (finding it sufficient that plaintiff was a high school graduate with more than two decades of experience in the business world). We thus conclude that this factor also does not weigh greatly in favor of one party or the other.

### C. Amount of Time Plaintiff Had to Examine Release

█ It is undisputed that Riddell executed the Release at the meeting where she was terminated. Riddell claims that she "was given approximately 3–5 minutes to review the document" and that neither Wade or Gowaty suggested that she take more time to deliberate. (Riddell Aff. ¶ 7.) Gowaty states that Riddell could have taken the document home but never asked. (Gowaty Aff. ¶ 5.)

We conclude that under the circumstances, Riddell did not have sufficient time to decide whether to sign the Release. Neither the wording of the Release or the MIIX representatives themselves informed Riddell that she had time to deliberate. *Cf. Cirillo,* 862 F.2d at 453 (release stated that employee could not sign it for 5 days); *Bennett,* 1993 WL 15603, at *3 (employer sent the release to plaintiff and invited him to talk about the release). MIIX had the Release ready to sign at Riddell's exit interview. *Cf. Mullen,* 733 F.Supp. at 1545 ("This is not the situa-

tion where the employer had a form on the desk ready to be signed."); *Bennett,* 1993 WL 15603, at *3 ("This is not a situation in which the employer required that the release be signed during an exit interview."). Nor did MIIX propose a deadline that might have alerted Riddell that she had time to make her decision. We conclude that a few minutes is not enough time for an employee just learning of her termination to knowingly and voluntarily waive her rights to sue. *See Cirillo,* 862 F.2d at 453 (noting that one month was "a reasonable time for deliberation"); *Cook,* 793 F.Supp. at 625 (giving the employee ten days to execute the release was not enough time to permit a terminated employee to deliberate); *McBriarty,* 1990 WL 10338, at *4 ("[F]our weeks is an adequate time period in which to ponder one's options and to consult with family members and others about the course one should take.").

MIIX argues that the language at the end of the memorandum stating that Riddell could call with questions reveals that Riddell had time to deliberate. (Gowaty Aff. ¶ 5.) We note that the language states that she could call with questions about the "severance package," not about the Release. (Riddell Aff., Ex. A.) Riddell might have questions about the extent and timing of her severance benefits even after executing the Release. The language, at best, only implicitly alerts Riddell that she has time to deliberate. Accordingly, we find that the lack of time Riddell deliberated, combined with MIIX's failure to suggest deliberation, weighs heavily against finding that her waiver was "voluntary and knowing."

#### D. *Plaintiff's Knowledge of Her Rights*

■ A release is more likely to be knowing and voluntary if the employee understood the rights being waived. Riddell claims that she did not realize that she was protected by age discrimination laws, disability discrimination laws and laws governing overtime wages. (Riddell Aff. ¶ 2.) We have not been provided with any contrary evidence. *Cf. Cirillo,* 862 F.2d at 453 (plaintiff admitted signing the release because he did not think he could win a discrimination suit); *McBriarty,* 1990 WL 10338, at *3 (plaintiff's job in

reducing labor force led the court to conclude that he knew or should have known of his rights); *Mullen,* 733 F.Supp. at 1544 (a notice concerning the ADEA was posted twenty feet from plaintiff's office).

Nor did the Release itself explain what rights plaintiff had under the law. *Cf. Cirillo,* 862 F.2d at 453 (the notice provision in the release explained the rights being released); *Ponzoni,* 774 F.Supp. at 311 (plaintiff was aware of rights because he signed a release that referred to the ADEA); *Bennett,* 1993 WL 15603, at *4 (same). This factor weighs in favor of finding that the Release was invalid.

#### E. *Plaintiff's Opportunity to Seek Counsel*

■ It is undisputed that Riddell did not discuss the Release with an attorney. The important consideration, however, is whether Riddell was encouraged to consult with an attorney. *See Cirillo,* 862 F.2d at 454 (noting that the most important consideration is whether consultation with a lawyer was encouraged); *Coventry,* 856 F.2d at 524 ("Also significant is the absence from the record of any indication that Hallas was encouraged by USS to consult an attorney prior to the execution of the release or that Hallas did in fact consult with an attorney."). MIIX does not claim to have suggested that Riddell speak with an attorney. Nor did the wording of the Release suggest that Riddell consult with an attorney. *Cf. Cirillo,* 862 F.2d at 450 (release stated that "you may also want to discuss the following release language with your lawyer"); *Ponzoni,* 774 F.Supp. at 312 (release explicitly stated that signatory had opportunity to consult with an attorney); *McBriarty,* 1990 WL 10338, at *4 (same); *Bennett,* 1993 WL 15603, at *3 (employee had to acknowledge in release that he had been given the opportunity to consult with an attorney before signing the release). The failure by MIIX to encourage Riddell to seek counsel is not dispositive. *See Mullen,* 733 F.Supp. at 1544. However, we conclude that it weighs considerably in favor of finding that the Release is invalid.

#### F. *Plaintiff's Opportunity to Negotiate*

The ability to negotiate suggests that the atmosphere surrounding the signing of the

release was not oppressive and thus indicates a voluntary waiver. *See Cirillo*, 862 F.2d at 454 n. 4 ("[T]he existence of an opportunity to negotiate with respect to a release is a substantial indicia that its execution was knowing and voluntary"). Gowaty alleges that Riddell negotiated during their meeting by seeking to include vacation pay in the severance agreement. (Gowaty Aff. ¶ 4.) MIIX submits a copy of the Release with handwritten notes along the margins that allegedly reflect this negotiation. (*Id.*, Ex. A.) If MIIX's claim of negotiations with Riddell were undisputed, then this factor would weigh in favor of finding a valid waiver.

Riddell, however, does not recall discussing vacation pay with Gowaty and the copy of the agreement that she claims Gowaty gave her does not contain any handwritten marks. (Riddell Aff. ¶ 7; *Id.*, Ex. A.) This court, for the purposes of a summary judgment motion, must view all evidence submitted in a light favorable to the party opposing the motion. *See Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir. 1991). We therefore must assume that no negotiations occurred. *Cf. Cirillo*, 862 F.2d at 455 n. 4 (plaintiff admitted that he attempted to negotiate an extension of employment); *Mullen*, 733 F.Supp. at 1544 (plaintiff met with company representative on two occasions to discuss the severance agreement; and agreement was not already written out); *McBriarty*, 1990 WL 10338, at *4. (individualized nature of actual memorandum revealed a negotiated agreement); *Orso v. ITT Corp.*, No. 89–270, 1991 WL 85826, at *6 (D.N.J. May 17, 1991) (terms of agreement were negotiated during a six-week period). We find that this factor weighs in favor of finding an invalid waiver.

### G. Consideration for Signing the Release

If the waiver is unsupported by consideration, then it is not enforceable. *See Cirillo*, 862 F.2d at 454. The Release provides Riddell with four weeks of salary. Riddell alleges, as we understand her argument, that the employee handbook requests that employees provide two weeks notice and that the four weeks salary could be in lieu of the employer giving similar notice. (Pl.'s Br. in Opp'n at 13.) This argument is not supported by evidence, and we find that Riddell did receive consideration for signing the release.

### H. Conclusion

■ Although some of the relevant factors weigh in MIIX's favor, our examination of the totality of the circumstances leads us to conclude that Riddell did not waive her rights knowingly and voluntarily as defined by the Third Circuit in *Coventry* and *Cirillo*. Riddell's allegation that she "was given only 3–5 minutes to review the document" weighs heavily in her favor. The agreement itself could have made a finding of a valid waiver more likely if the Release language: (1) was more prominent; (2) identified the rights being waived; and (3) informed Riddell that she had time to deliberate and a right to consult with an attorney.

### III. Release of the New Jersey State Law Claims

The Appellate Division of New Jersey Superior Court has adopted the totality of the circumstances test followed by the Third Circuit in *Coventry* and *Cirillo*. *See Swarts v. Sherwin–Williams Co.*, 244 N.J.Super. 170, 581 A.2d 1328 (App.Div.1990); *see also Keelan v. Bell Communications Research*, 289 N.J.Super. 531, 674 A.2d 603 (App.Div.1996). Consequently, our analysis set forth above reveals that Riddell did not execute a knowing and voluntary release of her state law claims.

### IV. Tender Back/Ratification

MIIX claims that, even if the Release were initially invalid, Riddell is still bound by the Release, because she ratified its terms by accepting the severance benefits. (Def.'s Br. in Supp. at 9, Def.'s Reply Br. at 5). MIIX argues that Riddell cannot challenge the Release while retaining her severance benefits. (Def.'s Reply Br. at 5.) This second argument is known as requiring "tender back" and is closely related to the concept of ratification. *See Long v. Sears Roebuck*, 105 F.3d 1529, 1540 n. 19 (3d Cir.1997) (quoting *Isaacs v. Caterpillar, Inc.*, 765 F.Supp. 1359, 1372 (C.D.Ill.1991)) ("States that require a tender to challenge a release sometimes use the

language 'condition precedent to suit' and sometimes use the language of 'ratification' [b]ut there is no meaningful difference between the two.").

### A. Analysis of the Tender Back/Ratification Doctrine under Federal Law Regarding the Release of the FMLA Claim

■ We find that the Third Circuit's opinion in *Long* provides guidance as to whether the doctrines of tender back and ratification should apply to the release of FMLA claims. *See Long,* 105 F.3d at 1529. In *Long,* the district court held that the terminated employee, by retaining his severance benefits, had ratified the allegedly defective release. *Id.* at 1533. The district court in *Ponzoni* had reached a similar conclusion in an ADEA case. *See Ponzoni,* 774 F.Supp. at 299. In *Long,* the Third Circuit reversed the district court and held that the retention of benefits does not ratify a release of ADEA claims. *See Long,* 105 F.3d at 1529. The court based its opinion in large part on the passage of the Older Workers Benefits Protection Act, ("OWBPA"), 29 U.S.C. § 626, which mandated certain requirements that must be met for a release of ADEA claims to be knowing and voluntary. The court noted that the ratification doctrine would be inconsistent with the goals of the OWBPA. *See Long,* 105 F.3d at 1538 ("The language of the OWBPA and its legislative history convince us Congress did not intend that the ratification doctrine be invoked to enforce the terms of a deficient release."). To the extent that the Third Circuit based its decision on the OWBPA, its opinion does not provide this Court with guidance.[1]

The Third Circuit in *Long,* however, found additional support beyond the OWBPA for rejecting the ratification and tender back doctrines. The court followed the reasoning employed by the Seventh Circuit in *Oberg v. Allied Van Lines,* 11 F.3d 679, 683 (7th Cir.1993). In *Oberg,* the Seventh Circuit noted that the concept of requiring an employee to return the severance benefits might seem "appealing under common law notions of fairness," but held that the Supreme Court's decision in *Hogue v. Southern R. Co.,* 390 U.S. 516, 88 S.Ct. 1150, 20 L.Ed.2d 73 (1968), compelled a different result. *Id.* In *Hogue,* the Supreme Court rejected the tender back requirement in a case arising under the Federal Employer's Liability Act, ("FELA"). *Id.* The *Oberg* court reasoned:

> In *Hogue,* the Court rejected any notion that state common law principles could help resolve the tender back question in FELA cases. The Court stated that "[t]he question whether a tender back of the consideration was a prerequisite to the bringing of the suit is to be determined by federal rather than state law." The Court went on to hold that an employee, who previously executed an employer release, need not, as a precondition to bringing suit under FELA, tender back to his employer any of the consideration he received for executing the release. The Court did, however, state that the benefits paid should be deducted from any award to the employee.

*Oberg,* 11 F.3d at 683–84 (citation omitted).

The *Long* court followed *Oberg* by ruling that the reasoning of *Hogue* should apply to claims arising under the ADEA, as well as to those under FELA, based on a number of factors. We find that these factors are equally applicable to FMLA cases, and consequently, that the doctrines of ratification and tender back should not apply to the FMLA.

The Third Circuit interpreted *Hogue* to mandate that tender back requirements imposed in connection with the release of federal rights be evaluated in light of the general policy of the statute in question. *Id.* at 1541 n. 22. The court noted that courts have ap-

---

1. We also note that the Supreme Court has recently adopted the Third Circuit rule by holding that releases which do not comply with the requirements of the OWBPA could not bar an employee's ADEA claims, even if the employee had not returned the severance benefits. *See Oubre v. Entergy Operations, Inc.,* —— U.S. ——, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998). In a brief opinion, the Court held that the language of the OWBPA stating that an employee "may not waive" an ADEA claim unless the release satisfies certain requirements precluded adopting the tender back doctrine. *Id.* 118 S.Ct. at 841. The Court's reliance on the wording of the OWBPA prevents the decision from serving as guidance in the case at bar.

plied *Hogue* to reject tender requirements in lawsuits brought under a variety of federal remedial statutes.[2] *Id.* The court then identified the ADEA as a federal remedial statute with the goals of compensating discrimination victims and deterring employers from practicing age discrimination. *Id.* at 1541. The court ruled that imposing a tender back rule in the ADEA context would compromise the purposes of the ADEA. The court cited with approval the concerns expressed by the Eleventh Circuit in a pre-OWBPA case:

> The Court in *Hogue* found that a tender requirement would deter meritorious challenges to releases in FELA lawsuits. The same deterrence factor applies to ADEA claims. Forcing older employees to tender back their severance benefits in order to attempt to regain their jobs would have a crippling effect on the ability of such employees to challenge releases obtained by misrepresentation or duress. Such a rule would ... encourage egregious behavior on the part of employers in forcing certain employees into early retirement for the economic benefit of the company. The ADEA was specifically designed to prevent such conduct, and we reject a tender requirement as a prerequisite to instituting a challenge to a release in an ADEA case.

*Long*, 105 F.3d at 1541–1542 (quoting *Forbus v. Sears Roebuck & Company*, 958 F.2d 1036, 1041 (11th Cir.1992)).

We find that FMLA is also a federal remedial statute and that imposing a tender back requirement would similarly compromise the underlying purposes of the statute. One of the purposes of FMLA is to "entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). Congress found that there was "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). Forcing employees with serious health problems to tender back their severance benefits would deter meritorious challenges to releases of FMLA claims and thus undermine Congress's goal of encouraging job security for such employees.

The Third Circuit in *Long* identified another factor favoring the rejection of the tender back and ratification doctrines in the ADEA context which applies in the FMLA context as well. The court noted that the tender back rule has considerable practical problems. *Long*, 105 F.3d at 1543–44. To require tender back of the full amount of severance benefits would force an employee to return a sum that typically incorporates consideration for factors in addition to the extra payment for signing the release. *Id.* at 1544. These factors could include, *inter alia*, rolled-in vacation and sick time. *Id.* Forcing the employee to return all their benefits "would appear to leave the employer better off and the employee worse off than they were under the status quo." *Id.* (citation omitted). The Third Circuit stated that "we are convinced that it would not serve the purposes of the ADEA to impose a tender requirement that creates such disputes and inequities." *Id.* Accordingly, we find that forcing Riddell to return all her severance benefits would also create practical problems that favor rejecting the tender back requirement.

In conclusion, we hold that Riddell does not have to tender back her severance benefits to challenge the release of the FMLA claim as doing so would contravene the poli-

2. See *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir.1993) (*Hogue* generalizable to other federal compensatory statutes including Title VII); *Home Box Office, Inc. v. Spectrum Electronics, Inc.*, 100 F.R.D. 379, 382 n. 1 (E.D.Pa.1983) (not citing *Hogue* but holding that under antitrust law benefits available under federal law cannot be defeated by state common law rules; no ratification where plaintiffs failed to tender back); *Wahsner v. American Motors Sales Corp.*, 597 F.Supp. 991 (E.D.Pa.1984) (not citing *Hogue* but finding Pennsylvania law with respect to ratification of releases incongruous with Automobile Dealers' Day in Court Act where Act was intended to provide redress for the very activity alleged; amount retained was to be set off against any damages); *Smith v. Pinell*, 597 F.2d 994, 996 (5th Cir.1979) (plaintiff allowed to proceed under Jones Act despite having signed release and received settlement); *Taxin v. Food Fair Stores, Inc.*, 287 F.2d 448 (3d Cir.1961) (in case involving Sherman Act, plaintiffs not required to tender back consideration received for release).

cies underlying the FMLA, in addition to creating practical problems.

*B.   Analysis under New Jersey Law of the Tender Back and Ratification Doctrines*

 MIIX has not identified any New Jersey decisions adopting the ratification and tender back doctrines. We can find only a handful of state courts that have adopted these doctrines with respect to employment matters. *See e.g., Hammond v. United of Oakland, Inc.,* 193 Mich.App. 146, 483 N.W.2d 652, 654 (Mich.App.1992). In light of the Third Circuit's reasoning in *Long,* we are not prepared to rule that the New Jersey Supreme Court would adopt the ratification and tender back doctrines. *See McBriarty,* 1990 WL 10338, at *7 n. 2 ("Defendant also argues that plaintiff's action is barred as a matter of law because he has failed to tender back monies he received. The courts of New Jersey have not yet addressed whether this approach, employed by the state courts in Michigan, should be adopted in this state. The court finds no reason to adopt this approach at this time.").

This Court has ruled that Riddell's waiver was not "voluntary and knowing" under the test created by the Third Circuit in *Coventry* and *Cirillo.* This Court has also ruled that the tender back and ratification doctrines do not apply to the claims made by Riddell in her Complaint. Accordingly, the motion for summary judgment by defendant MIIX is denied.